In the Matter of the Extradition
of Giovanni GAMBINO

No. M.J.NO. 05–876MBB.

United States District Court,
D. Massachusetts.

March 13, 2006.

John J. Commisso, Kelly, Libby & Hoopes, PC, Boston, MA, for Giovanni Gambino (1), Defendant.

Brian T. Kelly, United States Attorney's Office, Boston, MA, for USA, Plaintiff.

Paul V. Kelly, Kelly, Libby & Hoopes, PC, Boston, MA, for Giovanni Gambino (1), Defendant.

Edward S. Panzer, Esq., New York, NY, for Giovanni Gambino (1), Defendant.

George L. Santangelo, Esq., New York, NY, for Giovanni Gambino (1), Defendant.

Kimberly P. West, United States Attorney's Office, Boston, MA, for USA, Plaintiff.

### MEMORANDUM AND ORDER RE: FORMAL EXTRADITION REQUEST

### (DOCKET ENTRY # 18)

BOWLER, United States Magistrate Judge.

The United States of America ("the government"), acting on behalf of the Republic of Italy ("Italy"), seeks a certification by this court pursuant to 18 U.S.C. § 3184 ("section 3184") in order for a warrant to issue for the surrender of relator Giovanni Gambino ("the relator") to Italian authorities in accordance with the terms of the Extradition Treaty with Italy, Oct. 13, 1983, U.S.-Italy, 35 U.S.T. 3023, T.I.A.S. No. 10,837 (1983) ("the 1983 Treaty").[1] The relator opposes the extradition request.

Having previously pled guilty to conspiracy under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d) ("RICO" or "section 1962(d)"), in the United States District Court for the Southern District of New York, the relator seeks to bar extradition to Italy to face charges of criminal association and illegal trafficking in narcotic and psychotropic substances on the basis of the 1983 Trea-

ty's double jeopardy or *non bis in idem* clause. The relator further relies on the alleged absence of a charging document in the extradition papers and, alternatively, the absence of probable cause as to one of the charges lodged against him.[2]

### PROCEDURAL BACKGROUND

The case began on October 12, 2005, with the filing of a sealed complaint and the issuance of a provisional arrest warrant by this court. Within the required 45 days under the 1983 Treaty, the government filed the formal extradition request.

At the time of arrest, the relator was in custody at the Federal Medical Center in Devens, Massachusetts ("Ft. Devens"), a federal facility for offenders requiring specialized longterm medical care, serving the few days remaining on a 15 year sentence issued by the foregoing court as a result of the guilty plea. At his initial appearance on October 14, 2005, and having been transferred from Ft. Devens to the Massachusetts Correctional Institution in Plymouth, Massachusetts ("MCI Plymouth"), the relator raised concerns about the facility's inability to treat his medical condition.[3] In order to obtain additional information to better assess the relator's medical condition, this court adjourned the hearing until Monday October 17, 2005, at which time this court ordered the relator's detention albeit subject to certain provisions to accommodate the relator's health

---

1. Henceforth, this court will cite the 1983 Treaty as 35 U.S.T. 3023, T.I.A.S. No. 10,837 (1983).

2. The relator is no longer pressing the statute of limitations argument and the 1984 acquittal of the relator for participating in a conspiracy under article 75. (Docket Entry # 27, fn. 1; Docket Entry # 18, Ex. A, "SPATOLA and GAMBINO Alfonso were sentenced for the offence under section 75 of the Law

685/1975 as well (from which GAMBINO Giovanni was acquitted for lack of evidence)").

3. At the October 14, 2005 hearing, the relator's counsel stated that he was "convinced that [the relator's] had reasonably good care at Ft. Devens and he would be stable [there]." (Docket Entry # 13, p. 18).

at MCI–Plymouth.[4] (Docket Entry # 9). A further hearing took place on Friday October 21, 2005, at which time it became apparent that at least some of the provisions remained unfulfilled. Accordingly, this court urged the government to confer with the Bureau of Prisons in an to attempt to have the relator transferred to Ft. Devens. As a result, the relator was transferred to Ft. Devens over the weekend of October 22, 2004, where he remains to date.

Thereafter, this court held a number of extradition hearings and received additional filings, the most recent filing made by the relator on February 9, 2006. After receiving the February 9, 2006 filing, this court took the matter of the relator's extradition under advisement.

Because the scope and the existence of the charges lodged by the Italian authorities and whether such charges fall within the protection afforded by the 1983 Treaty's *non bis in idem* clause are at issue, the factual summary begins with a synopsis of the Italian and then the United States proceedings.

## BACKGROUND

### I. *Italian Proceedings*

As identified in the Certificate of Pending Prosecutions or "Certificato Dei Carichi Pendenti" issued by the Clerk of the Court of Palermo at the request of the Italian Judicial Authority on January 27, 2006 ("the 2006 carichi pendenti"), there are two pending prosecutions against the relator, the first designated as proceeding number 1885/86 and the second designated as proceeding number 002459/90/T ("proceeding number 2459/90"). As also stated therein, the former proceeding involves charges of violations of article 75 of the Italian Criminal Code while the latter proceeding includes a charge of a violation of article 71 of the Italian Criminal Code.

Turning to the former, an arrest warrant issued for the relator and 33 other individuals in proceeding number 1885/86 in November 1988. Resulting from more than two years of investigation on the part of the Italian police, the investigating magistrate of the Court of Palermo charged the relator and 19 other defendants in Count Two with a violation of article 75, a provision that criminalizes conspiracies to violate more than one offense under article 71 and/or other designated narcotics trafficking laws. (Docket Entry # 18, Ex. A). The charged conspiracy took place primarily in Palermo and Torretta[5] but also in the United States. Only two of the other 19 defendants in Count Two, Giuseppe Gambino and Lorenzo Mannino,[6] were also identified as defendants in racketeering act one of the Ninth Superceding Indictment ("the Indictment") in the United States District Court for the Southern District of New York in *United States v. Gambino et al.*, 88 Cr. 919(PKL) ("the

---

**4.** Conditions included directing the United States Marshals to inform officials at MCI–Plymouth that the relator should be housed in the facility's medical unit in a hospital bed with a trapeze, be given access to a handicapped shower, a CPAP machine for his sleep apnea and periodic blood screening every 14 days to monitor his Warfarin (Coumadin) levels plus all medications prescribed by the Bureau of Prisons. (Docket Entry # 9).

**5.** The prosecutor who wrote a summary of facts attributed to the relator as part of proceeding number 1885/86 identifies the places of where the crimes were committed as "(Palermo and Torretta)" as opposed to Palermo, Torretta *and the United States*. (Docket Entry # 29, Ex. B, ¶¶ 4 & 6).

**6.** That said, however, Lorenzo Mannino is not named at the outset of the arrest warrant as one of the 34 defendants against whom the arrest warrant issued.

New York case").[7]

The main goal of the conspiracy was "transporting large quantities of heroin from Torretta" to the United States "often with female body couriers carrying heroin who left Palermo airport pretending to go on vacation" and then "landed in New York, where the heroin was given to recipients." (Docket Entry # 29, Ex. ¶ 6). Article 75 provides that:

Article 75 (Conspiracy)

When three or more persons conspire together for the purpose of committing more than one offence among those foreseen in [the penal laws dealing with narcotics trafficking including article 71]; those who promote, form, organise or finance the conspiracy shall be punished, for this alone, by imprisonment not less than fifteen years and a fine of one hundred million lire up to four hundred million lire.

(Docket Entry # 18, Ex. A).

Count Three is the other count in the arrest warrant that includes the relator and, together with three other defendants,

likewise charges a criminal conspiracy under article 75. Of those three other defendants, Giuseppe Gambino is the only defendant also identified in racketeering act one of the New York case as a defendant. Whereas Count Two states that the group "committed crimes related to the traffic of high quantity of drug," Count Three, involving only four defendants, provides that the group "promoted, arranged and organised the criminal association described in [Count Two]." (Docket Entry # 18, Ex. A). Count Two therefore involves 20 conspirators who participated in crimes related to the trafficking of a high quantity of illicit drugs while Count Three identifies those defendants in Count Two who organized and promoted that conspiracy.

■ Both counts uniformly denote the presence of "aggravating circumstances" because the group consisted of "a criminal association in[sic] more than ten people" and because the group involved "a criminal association whose members used arms." (Docket Entry # 18, Ex. A). Article 75 expressly provides for increased penalties under either circumstance.[8]

---

7. As explained *infra*, the relator pled guilty to Count One of the New York case and allocuted his participation to *inter alia* racketeering act one which, in turn, incorporates the objects, means and overt acts of the conspiracy identified in Count Three. Although racketeering act one of the Indictment in the New York case does not identify Francesco Inzerillo, who is also one of the 19 defendants named in Count Two of the arrest warrant, the Indictment names him as co-defendant. In addition, a number of the defendants named in Count Two of the arrest warrant (Salvatore Inzerillo, Salvatore D'Amico, Salvatore Candela, Domenico Mannino and Francesco Gambino) are referenced as "co-conspirators" in various incorporated sections of Count Three and/or identified as members of the enterprise but, notably, not named as co-defendants thereby evidencing their lesser role in the New York case.

8. The relator asserts that he lacks notice of these separate charges and at the February 1,

2006 hearing represented that he had withdrawn the argument regarding the acquittal because he understood that he was not being charged with a violation of article 75. It is true that the Preventive Custody Order in Prison dated August 28, 1990, refers to the relator's acquittal for an article 75 charge. The 2006 carichi pendenti, however, unequivocally states that the article 75 charge was sent to the court on May 16, 1991, well after the Preventive Custody Order in Prison. Given the January 2006 date of the carichi pendenti, it is evident that the article 75 charge remains pending and viable.

It is also worth noting that although the initial complaint did not refer to article 75, the government forthrightly stated in the first memorandum it submitted in support of extradition (Docket Entry # 17) filed on December 16, 2005, that the "[r]elator was charged in Italy with conspiracy to commit crimes related to the traffic of high quantity of drug, in violation of Article 75" and then cited to

In addition to the charges in counts two and three, the arrest warrant contains 16 pages of facts captioned as "REASONS FOR THE DECISION" (henceforth: "the decision"). The final page orders the arrest of the cited defendants.[9] As explained and clarified therein, the criminal association aimed at "drug traffic from Sicily, in particular Torretta, to the [United States]" involving members of the Sicilian and American family known as "Cosa Nostra." The decision characterizes the relator as a member of the American Cosa Nostra and an important heroin runner from Sicily to the United States. (Docket Entry # 18, Ex. A). It also identifies Torretta as one of the relator's preferred heroin distribution channels and that the heroin is mainly handled by members of the Sicilian Cosa Nostra. The decision, which also identifies cocaine as part of the charged drug trafficking, describes how the relator and his brother (a co-defendant in Count One of the New York case) managed front activities in coffee bars and pizza restaurants that were actually utilized to sell off the high quantities of drugs with the support of employees of Sicilian origin.

Notably, after describing Giuseppe Gambino and the relator as belonging to the American Cosa Nostra, the decision distinguishes the American Cosa Nostra as "very different from the Sicilian association, even if they have close relations of cooperation with each other." (Docket Entry # 18, Ex. A). The different defendants charged in the arrest warrant from those charged in the New York case and the different focal points of the illicit activity support the distinction.

The time period of the conspiracy is not entirely clear from the decision although the November 30, 1988 arrest warrant results from "two years of inquiry that be-

---

the arrest warrant. (Docket Entry # 17, p. 10). This sentence appears immediately below the heading *"Offense Conduct in Italy."* Hence, the relator's February 7, 2006 second supplemental filing is misleading when it states that the government's December 2005 memorandum "identified *only* the 1990 Pretrial Custody Order as presenting the charge upon which extradition is sought." (Docket Entry # 34, p. 4; emphasis added). Furthermore, the relator's two experts both addressed the validity of the arrest warrant *before* the government ever filed the charging memorandum. (Docket Entry # 27, Ex. 1, ¶ 8; Docket Entry # 27, Ex. 2, p. 4). Finally, in addition to arguing the issue at the February 1, 2006 hearing, this court allowed the relator an opportunity to file another supplemental memorandum limited to five pages. The relator took full advantage of that opportunity by filing a 15 page "brief" and a nine page affidavit from Professor Bassiouni, his second affidavit after his live testimony at the December 20, 2005 hearing. For purposes of extradition, the relator's argument is therefore unavailing. *See Koskotas v. Roche,* 931 F.2d 169, 174–175 (1st Cir.1991) (rejecting due process argument regarding additional charges).

This court also finds that the government's oversight in not including the charge in the initial complaint was just that, an unintentional oversight inasmuch as during the February 1, 2006 hearing the Assistant United States Attorney candidly acknowledged her initial lack of familiarity with the nature of these complex proceedings.

9. Dr. Giuseppe Pignatone ("Dr. Pignatone"), Deputy Chief Prosecutor in Palermo, avers that he wrote "the summary of facts attributed to [the relator] ... as part of Criminal Proceeding number 373/88 A.P.M.," a designation that refers to the arrest warrant in proceeding number 1885/86. (Docket Entry # 29, Ex. B, ¶ 3). The investigating magistrate, the late Giovanni Falcone issued the arrest warrant which includes the 16 page decision. Although the relator complains about the allegedly missing summary, any such absence does not deprive the relator of any serious due process concerns. *See generally United States v. Kin–Hong,* 110 F.3d 103, 120 (1st Cir.1997) (recognizing that " 'serious due process concerns may merit review beyond the narrow scope of inquiry in extradition proceedings' ").

gan with the seizure of about Kg.6 of heroin at the airport of Palermo." The decision does identify heroin transactions that took place on October 21, 1987, and that one of the defendants contacted a "Greek drug pusher" and attempted to purchase numerous kilos of heroin "at the beginning of 1987." (Docket Entry # 18, Ex. A). Additional drug trafficking among the defendants is particularized as occurring on March 15, 1988 and August 5, 1988. Finally, the facts are based upon events occurring "up to today," i.e., up to and including November 30, 1988, but no later. This court therefore reasonably surmises that the charged conspiracy to traffic high quantities of heroin and cocaine existed from 1986 up to November 30, 1988.

In addition to the November 1988 arrest warrant, the extradition papers include the separate Italian proceeding identified by number 2459/90. Included in that proceeding are two documents, to wit, a Preventive Custody Order in Prison and a Report on Facts Ascribed to by Giovanni Gambino ("the report").[10] Turning to the former document, in August 1990, a judge of the Court of Palermo, Office of the Judge of Preliminary Investigation, issued the Preventive Custody Order in Prison ("the Preventive Order") against the relator at the request of the public prosecutor pursuant to sections 272 and 285 of the Criminal Procedure Code. (Docket Entry # 18, Ex. A). The Preventive Order charges the relator and three other individuals with *inter alia* violating articles 81 and 110 of the Italian Criminal Code.[11]

**10.** The Italian prosecutor who wrote the report avers that he prepared the summary as part of proceeding number 2459/90. (Docket Entry # 29, Ex. B, ¶ 4). Accordingly, he did not prepare the summary as part of proceeding number 1885/86. The report provides a summary of the facts of the case against the relator in proceeding number 2459/90 sufficient to make a finding of probable cause. Notwithstanding the relator's argument to the contrary (Docket Entry # 34, § I(B)), the report's reference to a single offense, which refers to the article 71 violation, is consonant with the fact that the report forms part of only one case (proceeding number 2459/90) as opposed to both cases (proceeding numbers 2459/90 and 1885/86). The fact that extradition is sought for both proceedings is evidenced by the fact that there is no other reason for the extradition papers to include the arrest warrant and the 16 page decision in this separate case. *See* 35 U.S.T. 3023, T.I.A.S. No. 10,837 (1983) (article X(2)(c) requires that "the texts of the laws describing the essential elements and the designation of the offense for which extradition is requested" shall accompany the extradition request). Moreover, the certification by the Minister of Justice of Italy on the first page of the formal extradition papers states that the relator is "charged with the offence of trafficking in narcotic drugs *and other offences*." (Docket Entry # 18, Ex. A; emphasis added). Use of

the plural "offences" to describe the charged offenses evidences that Italy seeks the relator for not just the article 71 violation in proceeding number 2459/90 but also for the article 75 violations in proceeding number 1885/86. Finally and again contrary to the relator's position, the arrest warrant is not superceded or merged into the Preventive Custody Order in Prison. The arrest warrant contains a separate case number and was sent to the court at a different time.

**11.** Article 81 reads as follows:

ART. 81 Penal code (Formal concurrence. Continuous offence)
Who commits one act or forbearance infringing lots of provisions or commits more infringements of the same provision shall be punished with the penalty that should be applied for the most serious infringements that is increased till three times more.
Who commits more acts or forbearance of the same criminal plan infringing even in different times more than one or more provisions shall be punished with the same penalty. In the cases provided by this article the penalty cannot be superior to that enforceable as to the previous articles.
(Docket Entry # 18, Ex. A). Article 110 of the Italian Penal Code, captioned "Penalty for those who participated in the offence," states that, "When more people participate in the

These articles impose increased penalties for participating in an offense and engaging in a continuing offense.[12]

More notably and as also included in the January 2006 carichi pendenti, the Preventive Order charges the relator with *inter alia* violating article 71 of the Italian Criminal Code which criminalizes the illegal trafficking in narcotic and/or psychotropic substances. Article 71 criminalizes, among other acts, the production, cultivation, manufacture, refinement, sale, receipt, distribution, exportation and possession of narcotic and/or psychotropic substances. The relevant provision reads as follows:

> Article 71 (Unlawful activities)
>
> ... Any Person who, without authorization as per Art. 15, cultivates, produces, manufactures, extracts, offers, places on sale, distributes, buys, transfers or receives for any reason, procures for others, transports, imports, exports, passes in transit or unlawfully possesses, apart

from the cases provided for in Arts. 72 and 72 bis, any of the narcotic or psychotropic substances indicated in List I or III in Art. 12, shall be punishable by a term of imprisonment ....

(Docket Entry # 18, Ex. A). The punishment increases if it "is committed by three or more persons in complicity together." (Docket Entry # 18, Ex. A).

Separate and apart from the article 71 charge, the Preventive Order appears to reference a violation against the relator and three other individuals of article 74 for an illegal criminal association.[13] Article 74 makes illegal a criminal association in narcotic and psychotropic substances trafficking. The statute provides:

> Article 74 (...). (Criminal association in narcotic and psychotropic substances trafficking).
>
> When three or more persons conspire to commit more than one of the offences mentioned in Art. 73, those who promote, constitute, manage, organize or

---

same offence, each of them shall be subject to the punishment prescribed for such offence, except as provided in the following articles." (Docket Entry # 18, Ex. A).

The discrepancies in the language of these and *other* statutory provisions in the formal extradition papers, which include several versions of the statutes, do not materially change the substance of the charges lodged against the relator.

**12.** Although the Preventive Order speaks in terms of "sections 81, 110 of the Criminal Code" as opposed to articles 81 and 110 and also speaks in terms of "section[s] 71, 74 and 75 of the Law 685/1975" as opposed to articles 71, 74 and 75, the formal extradition papers containing the substance of these provisions uniformly refer to them as articles rather than sections. This court finds they are the same provisions and, to avoid confusion, refers to them as articles.

**13.** Both experts for the relator note that the Preventive Order "with respect to the *substantive* crime" refers to both article 71 and

article 74. (Docket Entry # 27, Ex. 1, ¶ 11; Docket Entry # 27, Ex. 2, p. 4; emphasis added). The 2006 carichi pendenti also cites to both articles 71 and 74 as well as to "crimes" in the plural with respect to proceeding number 2459/90. The Preventive Order similarly refers to "offences" in the plural and cites to both articles 71 and 74. In contrast, the report refers to "offence" in the singular and cites to article 71, "aggravated by the fact that [the relator] belonged to a criminal association, and he committed the facts in respect of huge amounts of narcotic drugs (art. 74 ...)." This court's review of article 71 shows the aggravating circumstance of committing the offense with three of more people, i.e., a criminal association, but not explicitly the aggravating circumstance of a huge quantity of narcotic drugs. Article 71 does impose a larger sentence range for narcotic or psychotropic substances listed in tables I and II of article 12 and a lesser sentence range for narcotic or psychotropic substances listed in tables II and IV of article 12. The tables, however, are not included in the extradition papers.

finance the association shall, only for this, be punished by a term of imprisonment of not less than 20 years. (Docket Entry # 18, Ex. A). Finally, the Preventive Order recites that "the offence under section 416 b of the Criminal Code [is] contested by Gambino Alfonso only." (Docket Entry # 18, Ex. A).

The government in its filing identifying the charges (Docket Entry # 28, pp. 2–3) and in the initial complaint (Docket Entry # 1, ¶ 3), however, refers only to the violation of article 71 as sought under the Preventive Order, aggravated by the relator belonging to a criminal association and the involvement of large amount of drugs in violation of article 74. Both of the relator's two experts agree that the crime is "illicit drug trafficking under Article 71, and the penalty for it includes aggravating circumstances under Article 74." (Docket Entry # 27, Ex. 1, ¶ 11; Docket Entry # 27, Ex. 2, p. 4). Given the position of the government, which is acting on behalf of Italy, this court therefore finds that the charge set forth in proceeding number 2459/09 for which extradition is sought is the charge of a violation of article 71 with aggravating circumstances under article 74.

The Preventive Order sets forth the factual basis for the article 71 violation without distinguishing between the different statutory sections. These facts charge the relator and three other defendants [14] with the manufacture in 1979 of 100 kilograms of morphine together with 50 kilograms of tropeine refined into heroin in 1979 at a facility in Baida belonging to Rosario Spatola ("Spatola").[15] The crime was therefore "committed in Palermo where [the relator] arrived solely for that purpose." (Docket Entry # 29, Ex. B, ¶ 6). Marino Mannoia ("Mannoia"), another participant, reconstructed the details of the episode including the destination of the refined heroin to the relator in the United States. Indeed, Mannoia saw the relator, who "'came from the United States to arrange the production of the considerable quantity of heroin,'" on three occasions. (Docket Entry # 18, Ex. A). The last visit took place at the laboratory in Baida.

The Preventive Order additionally depicts adding tropeine to the heroin in another facility, to wit, a house belonging to Gambino Alfonso ("Alfonso")[16] near a bus storage area in Passo di Rigano. "All of the offences were committed in Palermo and other places, before May 5, 1980," according to the Preventive Order. (Docket Entry # 18, Ex. A).

The extradition papers also include the report which tracks the recitation of facts in the Preventive Order and concerns proceeding number 2459/90. Both documents equally depict similar events which provide a factual basis supporting the article 71 charge in proceeding number 2459/90. Citing and relying upon the Preventive Order, the report states that the relator "was charged" with the "purchase, keeping, transport, refining and export of narcotic drugs (heroin) committed in complicity with other persons" in violation of article 71,[17] "aggravated by the

---

14. The three other charged defendants do not overlap with the defendants named in Count One of the New York case. A few of the individuals noted in the supporting facts for the charges in the Italian proceeding, however, are the same as those identified in the overt acts in Count Three.

15. The Preventive Order also charges Spatola for violating the foregoing statutes.

16. The Preventive Order also charges Alfonso for violating the foregoing statutes.

17. The report also cites to the penalty statutes of articles 81 and 110 of the Italian Criminal

fact that [the relator] belonged to a criminal association, and he committed the facts in respect of huge amounts of narcotic drugs," citing article 74.[18] (Docket Entry # 18, Ex. A).

As elucidated in the report, "The offences were committed in Trapani, Palermo and other places in Italy and abroad in the period from 1979 to 1980."[19] (Docket Entry # 18, Ex. A). Mannoia related certain facts ascribed to the relator. In particular, the report notes that Mannoia detailed the aforementioned manufacture of the 100 kilograms of heroin and 50 kilograms "of tropine" that occurred in Baida. Mannoia indicated that he personally manufactured the morphine and "that the refined heroin was to be sent to U.S. and more precisely to Giovanni Gambino (also known as John) 'who came from United States to agree on the huge amount of heroin.'" (Docket Entry # 18, Ex. A). Mannoia also related how he saw the relator on three occasions, the last occasion being at the laboratory in Baida where the relator ascertained how the drug was manufactured. Finally, Mannoia described how he mixed heroin "with 'tropine' . . . 'in the house of Alfonso Gambino, a new house under construction located nearby the bus deposit of Passo di Rigano.'" (Docket Entry # 18, Ex. A).

To confirm the declarations made by Mannoia, which the report characterizes as "very detailed and precise," the report refers to the relator's December 1984 conviction for violating article 416 and notes the relator's acquittal for violating article 75 due to lack of evidence. Finally, the report states that the relator came to Italy on more than one occasion "using false documents." (Docket Entry # 18, Ex. A). The report concludes with the statement that, "The offence ascribed to Gambino shall be extinguished after the expiry of the maximum term of the period of limitation, in 2009 (thirty years after the commission of the facts)." (Docket Entry # 18, Ex. A).

On November 15, 2005, the Minister of the Italian Ministry of Justice certified the extradition papers and explained that the relator was "charged with the offence of trafficking in narcotic drugs and other offences, alleged to have been committed in Italy." (Docket Entry # 18, Ex. A). Two days later, the Minister Counselor of the United States at Rome also certified the extradition papers. She likewise stated that the relator was charged with "drug trafficking and other offenses, alleged to have been committed in Italy." (Docket Entry # 18, Ex. A). Accordingly, on November 25, 2005, the Italian Embassy, on behalf of the Italian Minister of Justice, presented a "Note Verbale" to the United States Department of State formally requesting the relator's extradition. The note references the charges in the arrest warrant "for participating in a criminal

Code. The complete reference reads "Articles 81, 110 of the criminal code, 71 of Law no. 685 dated 22.12.1975." (Docket Entry # 18, Ex. A).

**18.** The full citation in the report reads "art. 74 paragraph 1 and 2 and paragraph 2 of the aforementioned law." (Docket Entry # 18, Ex. A).

Unlike the New York conspiracy, which involves heroin and cocaine, the article 71 violation involves only heroin with a focal point being a particular shipment of heroin as well as the aggravating circumstance of belonging to a criminal association which, again, only involved heroin. The judge that issued the Preventive Order states that the criminal association was "a continued and well organised activity for exporting heroin in the U.S.A., refined in different places in the province of Palermo." (Docket Entry # 18, Ex. A). The report echos this description of the criminal association.

**19.** The report later confines the time period to offenses committed before May 5, 1980.

association with the scope of trafficking narcotics" and the charges in the Preventive Order "for violating narcotics laws." (Docket Entry # 18, Ex. A).

The 2006 carichi pendenti recites both the proceeding involving the violation of article 71, which includes the Preventive Order and the report, and the proceeding involving the article 75 violations charged in the arrest warrant. The recent date of the 2006 carichi pendenti confirms the continued viability of both proceedings and the foregoing charges against the relator.

In sum, the relator is charged with illegal narcotics trafficking under article 71 through his involvement in the manufacture of 100 kilograms of morphine into heroin, personally manufactured by Mannoia, in a group of buildings in Baida in 1979 for delivery to the relator in the United States, aggravated by belonging to a criminal association to export heroin during the period of 1979 to May 5, 1980. The relator is also charged with participating and leading a criminal conspiracy from 1986 to the late fall of 1988 involving the trafficking of heroin and cocaine in violation of article 75.

## II. *United States Proceedings*

In January 1994, the relator pled guilty to Count One of the Indictment in the United States District Court for the Southern District of New York in *United States v. Gambino et al.,* 88 Cr. 919(PKL). The plea occurred after a lengthy trial that took place the year before and ended in a hung jury on all but one count for bail jumping. Notably, the relator did not plead guilty to the entirety of Count One, a RICO criminal conspiracy count charging the violation of section 1962(d). Rather, the relator pled guilty to Count One and allocuted his participation solely to racketeering acts one, 24, 27 and 28 in Count One of the Indictment.

The relator entered the plea pursuant to a plea agreement contained in a January 5, 1994 letter signed by the government and the relator. That letter states, in pertinent part, that the relator agrees to plead guilty and "to allocute his participation in (1) the murder of Francesco Oliveri, (2) the conspiracy to distribute narcotics, (3) the loansharking operation, and (4) the gambling operation at the Caffe Giardino as charged in Racketeering Acts Twenty–Eight, One, Twenty–Four, and Twenty–Seven of Count One." (Docket Entry # 17, Ex. B). Racketeering acts one, 24, 27 and 28 in the Indictment, which correspond to the foregoing allocutions, are: (1) the continuing conspiracy to distribute narcotics (racketeering act one); (2) the loansharking operation (racketeering act 24); (3) the gambling operation at the Caffe Giardino (racketeering act 27); and (4) the murder of Francesco Oliveri (racketeering act 28). All parties agree that the relevant racketeering act with respect to the relator's extradition is number one, the conspiracy to distribute narcotics. The plea agreement does not reference or limit the plea agreement to a conspiracy to import 40 kilograms of heroin into the United States.

At the January 5, 1994 plea hearing and consistent with the plea agreement in the letter, the prosecutor listed the racketeering acts committed by the relator as "acts 1, 24, 27 and 28" as what the government would prove at trial and then asked the relator if he "participate[d] in the racketeering enterprise by committing racketeering acts involving heroin and cocaine trafficking." (Docket Entry # 17, Ex. C, p. 34). The relator answered, "Yes." He further acknowledged that the "enterprise operate[d] in the time frame from 1975 to August 1, 1992." (Docket Entry # 17, Ex. C, p. 33). That time period corresponds to the time period set forth in racketeering act one in the Indictment which is engag-

ing in a conspiracy from "January 1, 1975, up to and including the date of the filing of this Indictment," which was September 28, 1992.[20] (Docket Entry #19, Ex. A, ¶ 15; Docket Entry #27, Ex. 3, p. 2, "Ten Count Indictment (9S) 88 CR 919 was filed in the Southern District of New York on September 28, 1992").[21]

Racketeering act one in the Indictment incorporates by reference all of "the overt acts committed in furtherance of the conspiracy" as the overt acts set forth in Count Three.[22] Two of the 81 subparagraphs of overt acts listed in Count Three directly relate to the subject of the Italian proceeding number 2459/90 for the violation of the drug trafficking statute in article 71. In particular, subparagraphs 48(2) and 48(5) of Count Three, incorporated into racketeering act one as overt acts, consist of the relator's visit to "a heroin facility outside Palermo" in 1979 and Mannoia's [23] refinement of 100 "kilograms of heroin for shipment to [the relator]" in early 1979. (Docket Entry #19, Ex. A, ¶¶ 15, 48(2) & 48(5)). The former corresponds to Mannoia's recitation that he saw the relator in the laboratory in Baida contained in both the Preventive Order and

the report. The latter corresponds to Mannoia's manufacture of 100 kilograms of heroin in 1979 in Baida for shipment to the relator in the United States noted in both the Preventive Order and the report.

Mannoia's testimony during the 1993 trial in New York further elucidates the nature of the 100 kilogram shipment and additional shipments to Gambino noted in the Indictment and incorporated by reference as an overt act into racketeering act one. Mannoia testified that in or around the start of spring 1979, he refined the 100 kilograms of heroin in the animal barn belonging to Spatola in Baida. The refined heroin was to be shipped to the relator in the United States. (Docket Entry #19, Ex. D, pp. 332, 353 & 365). As indicated above, this same shipment is also the subject of the article 71 violation for illegal drug trafficking[24] charged in proceeding number 2459/90 and set forth in the Preventive Order and the report.

At the January 5, 1994 plea hearing, the relator did not, however, plead to committing the underlying crime of manufacturing, importing or exporting the 100 kilograms of heroin refined by Mannoia in 1979 and shipped to him in the United States.[25] Likewise, turning to the Indict-

---

**20.** The judgment confirms that the offense concluded on September 28, 1992.

**21.** The relator's argument regarding the factual similarity between the arrest warrant and the New York case on the basis that the November 30, 1988 warrant was issued "one day before the New York indictment charging Mr. Gambino with participating in a conspiracy 'up to and including the date of the filing of this Indictment'' ' and then citing the Ninth Superceding Indictment at page nine (Docket Entry #34, fn. 5) is, accordingly, misguided.

**22.** Count Three, a narcotics distribution conspiracy under "21 U.S.C. § 846 requires no overt act in furtherance of the conspiracy" in order to establish a conviction. *United States v. Nelson–Rodriguez,* 319 F.3d 12, 28 (1st Cir. 2003) (citing *United States v. Shabani,* 513 U.S. 10, 15, 115 S.Ct. 382, 130 L.Ed.2d 225

(1994)). Likewise, Count One, the RICO conspiracy count under section 1962(d), "do[es] not require proof of an overt act." *United States v. Salmonese,* 352 F.3d 608, 620 (2nd Cir.2003). Facts supporting the overt acts are therefore not necessarily material facts.

**23.** The report and Preventive Order refer to Marino Mannoia. The Indictment and trial transcripts refer to Francesco Marino Mannoia.

**24.** As previously noted, the statute makes unlawful the production, manufacture, sale, distribution, transfer, transport, import and export of narcotic and psychotropic substances.

**25.** In addition to setting forth the refinement by Mannoia of the 100 kilograms as an overt act of the RICO conspiracy count, the Indict-

ment, the relator did not plead guilty to Count Five, the only count in the ten count Indictment charging an illegal distribution or attempt to distribute a narcotic substance in violation of 21 U.S.C. § 841.

Additional subparagraphs of overt acts in Count Three, which are incorporated into racketeering act one as overt acts, describe the relator's attendance at a dinner party at the Baby Luna Restaurant in Sicily in early 1979 with Stefano Bontate ("Bontate") and Salvatore Inzerillo,[26] who are also referred to in the related underlying facts supporting the charges in the Preventive Order concerning the 100 kilograms of heroin refined in Baida for shipment to the relator. The incorporated overt acts in Count Three additionally describe the refinement in Sicily of 130 kilograms of heroin in the summer of 1979 and 200 kilograms of heroin in the fall of 1979 and the spring of 1980 both "for shipment to [the relator]." (Docket Entry # 19, Ex. A, ¶¶ 48(6) & 48(7)). Mannoia's 1993 testimony likewise details separate shipments for Bontate of 50, the foregoing 100, 100, 60, 80, 50, 20[27] and the foregoing 130 kilograms of heroin for delivery to the relator in the United States. (Docket Entry # 19, Ex. D, pp. 354–357 & 362–368). Bontate is not one of the 34 defendants charged in the article 75 criminal conspiracy in the arrest warrant in proceeding number 1885/86. He is, however, noted as taking part in the transport of the 100 kilograms of heroin in 1979 detailed in the Preventive Order and report in proceeding number 2459/90.

At the plea hearing itself, the relator pled guilty to Count One and allocuted his participation to racketeering act one. He admitted to "participat[ing] in a plan to arrange the importation of 40 kilograms of heroin to the United States which resulted in a seizure in Milan in March of 1980," a plan that the Indictment includes as an overt act in Count Three incorporated by reference into racketeering act one as an overt act.[28] (Docket Entry # 17, Ex. C, p.

---

ment identifies Mannoia's refinement of and the relator's importation of shipments of 100, 130 and 200 kilograms of heroin respectively in early 1979, the summer of 1979 and from the fall of 1979 to the spring of 1980 as racketeering acts two through four. (Docket Entry # 19, Ex. A, ¶¶ 15, 16, 48(5)). The relator, however, did not allocute his participation to these racketeering acts. As stated *infra*, a number of overt acts in Count Three, incorporated by reference as overt acts into racketeering act one, however, include the foregoing shipments.

**26.** As noted in a previous footnote, Salvatore Inzerillo is also named as one of the 20 defendants in Count Two of the arrest warrant in proceeding number 1885/86 charging the criminal conspiracy. Salvatore Inzerillo and Bontate, although not named as defendants in the New York case, are identified as members of the enterprise who, together with the relator and seven other named individuals, associated in fact to commit the racketeering acts in the New York case. (Docket Entry # 19, Ex. A, ¶ 7). Mannoia was first told by Bon-

tate about the heroin shipments going to the relator "when [Bontate] created a partnership with [the relator] and Salvatore Totuccio Inzerillo," according to Mannoia's testimony. (Docket Entry # 19, Ex. D, p. 365).

**27.** It is not entirely clear what portion of these shipments is included in the aforementioned 200 kilograms.

**28.** The following question and answer took place:

[The government]: Now, your Honor, as to the heroin activities I have questions just for Mr. John Gambino and Mr. Joseph Gambino but not for Mr. Lorenzo Mannino. Mr. John Gambino, did you participate in the enterprise's activities which involved the shipping of significant amounts of heroin to the United States?
Defendant John Gambino: Yes.
[The government]: And in particular, did you participate in a plan to arrange the importation of 40 kilograms of heroin to the United States which resulted in a seizure in Milan in March of 1980?

35; Docket Entry # 19, Ex. A, ¶¶ 48(15) & 48(16)). In a more encompassing acknowledgment, the relator admitted to "participat[ing] in the enterprise's activities which involved the shipping of significant amounts of heroin to the United States." [29] (Docket Entry # 17, Ex. C, p. 36). When asked to describe in his own words what he did as part of the "racketeering enterprise's heroin activity," the relator stated, "Yes. I *agreed* with other people to import a quantity of heroin into the United States. In 1979." (Docket Entry # 17, Ex. C, p. 36; emphasis added). Later during the plea hearing, the relator did not object to the prosecutor's generalized statement that, "if there had been a trial, the government would prove . . . that the enterprise," as opposed to a particular individual or defendant, "was involved in trafficking substantial amounts of heroin, *including* a shipment of 40 kilograms of heroin which was seized in Milan in 1980, and other shipments from Stefano Bontate and Sal Inzerillo." [30] (Docket Entry # 17, Ex. C, p. 37; emphasis added).

At the hearing, the relator's counsel was careful to delineate the limited scope of the plea to conform to the letter agreement as exemplified by the following colloquy:

The Court: Mr. John Gambino, do I understand that you are offering to plead guilty because you are guilty of Count One?

Defendant John Gambino: Yes, your Honor.

. . . .

Mr. Santangelo: [31] Your Honor, just so it is clear, the defendant understands that he's pleading guilty to Count One, and he will allocute to his participation as outlined in the letter. However, he wants to make clear on the record that all of the allegations in Count One, in toto, are not what he is pleading guilty to, there are many, many allegations in that count. We will allocute sufficiently to satisfy the Court and the government pursuant to the letter that we are guilty of a crime. However, we do not want to mislead the Court or anyone who reads these proceedings that everything that is said in Count One is being pleaded guilty to by Mr. John Gambino.

The Court: I understand.

(Docket Entry # 17, Ex. C, pp. 27–28).[32]

During the hearing, the prosecutor also inquired about the racketeering enterprise's objects. Racketeering act one equates the objects of the conspiracy to the objects set forth in Count Three. The

Defendant John Gambino: Yes.
(Docket Entry # 17, Ex. C, p. 35).

**29.** The relator elsewhere during the plea hearing similarly couched his involvement as with the enterprise's activities as opposed to personally committing the underlying trafficking offenses. In particular, near the end of the hearing, the relator answered "Yes" to the following question posed by the government: "Mr. John Gambino, the acts you described above-the racketeering acts that are described above, were committed as part of the enterprise you described earlier?" (Docket Entry # 17, Ex. C, p. 46).

**30.** As shown through Mannoia's 1993 testimony, at least 20 kilograms of the 40 kilograms seized was "to go to the United States

to John Gambino." (Docket Entry # 19, p. 428). During the first trial, Mannoia testified at length about the 40 kilogram shipment seized at the Milan airport. (Docket Entry # 19, pp. 418–431).

**31.** Attorney George Santangelo represented the relator at the plea hearing.

**32.** Thus, as evidenced throughout the record, the relator admitted to committing overt acts as incorporated into racketeering act one. He did not admit to committing the facts in Count Three as anything other than overt acts or as the means or objects of the section 1962(d) conspiracy.

relevant pleaded objects of the conspiracy set forth in Count Three and incorporated into racketeering act one are the distribution and intent to distribute in excess of one kilogram of heroin and in excess of five kilograms of cocaine. (Docket Entry # 19, Ex. A, ¶¶ 15 & 41–42). When asked at the plea hearing if the enterprise had a common goal functioning on a continuing basis, the relator answered, "Yes, we hung out together." (Docket Entry # 17, Ex. C, p. 33).

Also during the plea hearing, the relator acknowledged his participation "in a racketeering enterprise whose activities were centered around 18th Avenue in Brooklyn but which also involved some conduct in the Southern District of New York." (Docket Entry # 17, Ex. C, p. 30). He also agreed that "the conduct relating to the heroin act, trafficking activity, occur[red] in" New York. (Docket Entry # 17, Ex. C, p. 37). At the close of the hearing, the relator waived a detailed reading of the Indictment and pled guilty to Count One.

At the June 15, 1994 sentencing hearing, the trial judge sentenced the relator under Count One to the agreed upon 15 year sentence set forth in the plea agreement.[33] Although the trial judge noted that the June 1994 presentence report ("PSR") was "a faithful summary of the government's evidence at trial" at the sentencing hearing, he recognized that the PSR contained additional matters that were not allocuted to the defendants.[34] (Docket Entry # 19, Ex. B, p. 3). The trial judge then carefully explained that the defendants were not waiving their objections to the summary in the PSR and that he would sentence the defendants based only upon what was allocuted. (Docket Entry # 19, Ex. B, pp. 4 & 10). As previously explained, the relator pled guilty to Count One and allocuted his participation to racketeering act one (the conspiracy to distribute narcotics) as well as three other racketeering acts not germane to the present proceedings. Hence, although the relator points out the similarities between a presentence report dated in March 1994 to the facts set forth in Count Three (Docket Entry # 27, fn. 7 & 8), the relator was not, by virtue of the PSR at least, held accountable for the facts set forth in Count Three or otherwise sentenced to 15 years imprisonment based upon the PSR. Rather, the trial judge sentenced the relator to 15 years imprisonment on Count One based upon what was allocuted in the plea agreement as opposed to the facts or acts in the PSR.[35] (Docket

**33.** This sentencing was consistent with the trial judge's previous admonition to the relator at the plea hearing during which he made certain the relator understood that, "regardless of what the Probation Department may say to the Court about the sentencing guideline range, the government is agreeing in its plea agreement that its recommendation to the Court will be 15 years." (Docket Entry # 17, Ex. C, p. 18).

**34.** The trial judge sentenced the relator and two other co-defendants in one proceeding. The PSR before the trial judge at the June 15, 1994 sentencing was longer in length and dated differently from the prior March 1994 presentence report submitted by both the government and the relator.

**35.** The plea agreement nowhere refers to the PSR or a previous version thereof. The primary reference to the PSR, one dated differently from the PSR filed by both the government and the relator, at the sentencing hearing in connection with the relator was to the PSR's reference to the possibility of a downward departure based upon the relator's health. Notably, the trial judge did not abide by the possibility of a downward departure contained in the PSR.

As distinct from the 15 year sentence, the trial judge did rely on the PSR in the course of imposing a $250,000 fine against the relator. (Docket Entry # 19, Ex. B, p. 30, 1. 11–13). A fine, however, is not a "sentence" within the meaning of article VI of the 1983 Treaty.

Entry # 19, Ex. B, pp. 3–4, 10, 21 (1.23–25), 22 (1.1–2) & 28 (1.10–18)).[36]

At the sentencing hearing, the government asked the trial judge to dismiss all open counts except for forfeiture counts nine and ten, pending a filing from the government. The trial judge then stated he was "dismissing all the open counts other than the two counts referred to by the government," whereupon the government identified a third count, the bail jumping count. The trial judge agreed to also leave that count open and stated that, "All prior indictments other than what has been spoken to by the government all open counts are dismissed." (Docket Entry # 19, Ex. B, p. 27).

The judgment against the relator states that counts two through seven "and all prior indictments are dismissed on the motion of the United States." (2/1/06 Hearing, Ex. 4). The judgment does not check the box immediately above this language that, "The defendant has been found not guilty on count(s)＿＿＿＿＿＿ and is discharged as to such count(s)." (2/1/06 Hearing, Ex. 4).

## DISCUSSION

The relator's arguments center around the 1983 Treaty's *non bis in idem* clause, the absence of probable cause and a summary of facts under article X of the 1983 Treaty with respect to the article 75 violations in the arrest warrant and the absence of a valid charging document under article I of the 1983 Treaty. The arguments are addressed seriatim.

**36.** The above citations to the sentencing transcript emphatically clarify that the trial judge sentenced the relator under Count One based upon what was allocuted.

## I. *1983 Treaty's Non Bis in Idem Clause*

The relator raises a series of arguments concerning the import of the 1983 Treaty's *non bis in idem* clause. First, the relator asserts that he has been convicted in the New York case based upon the same or substantially the same facts for which his extradition is sought by Italy. Next, he maintains that he has served the sentence imposed for the same or substantially the same facts for which Italy requests his extradition. Conversely, the relator argues that if he has not been convicted or served the sentence for the same or substantially the same facts then he must have been acquitted of those facts. All of these arguments turn upon the language employed in the 1983 Treaty's *non bis in idem* clause to which this court now turns. Unfortunately, the English version and the Italian translation employ different terms.

In a change from the prior 1973 Extradition Treaty with Italy, Jan. 18, 1973, U.S.-Italy, 26 U.S.T. 493, T.I.A.S. No. 8052 (1973) ("the 1973 Treaty"),[37] the *non bis in idem* clause in the 1983 Treaty reads as follows:

### Article VI
### *Non Bis in Idem*

Extradition shall not be granted when the person sought has been *convicted, acquitted* or pardoned, or has *served the sentence imposed,* by the Requested Party *for* the same *acts* for which extradition is requested.

35 U.S.T. 3023, T.I.A.S. No. 10,837 (1983) (emphasis added). The Italian version uses the term "stessi fatti" for the English phrase "same acts." Translated into English, "stessi fatti" "means 'for the same facts.' "[38] (Docket Entry # 23, p. 48;

**37.** Henceforth, this court will cite the 1973 Treaty as 26 U.S.T. 493, T.I.A.S. No. 8052 (1973).

**38.** Professor Bassiouni, the relator's expert, provided this translation by affidavit and at

Docket Entry # 27, Ex. 1, ¶ 4). Notably, immediately above the signatures of the parties, the 1983 Treaty provides that both the English and the Italian versions of the 1983 Treaty are "equally authentic." 35 U.S.T. 3023, T.I.A.S. No. 10,837 (1983) ("DONE at Rome ... in duplicate in the English and Italian languages, both equally authentic"). The 1973 Treaty used the term "offense" in lieu of the term "same acts." [39]

■ Interpretation of an international treaty begins with the language itself unless it effects a result inconsistent with the parties' intentions. *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 180, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982) ("clear import of treaty language controls unless 'application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories' "); *see Elcock v. United States*, 80 F.Supp.2d 70, 78 (E.D.N.Y.2000) (interpretation of treaty must begin with the treaty's language); M. Cherif Bassiouni *International Extradition: United States Law and Practice*, ch. II, § 5.3 (4th ed.2002) (summarizing treaty interpretation rules, the first being, "The purpose of treaty interpretation is to as-

certain the plain meaning of the language that comports with the parties' intentions"). As further explained by the Court in *Sumitomo*, a court's role "is limited to giving effect to the intent of the Treaty parties." *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. at 185, 102 S.Ct. 2374; *accord Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 10, 57 S.Ct. 100, 81 L.Ed. 5 (1936) (stating "familiar rule that the obligations of treaties should be liberally construed so as to give effect to the apparent intention of the parties").

■ Interpreting a treaty thus starts " 'with the text of the treaty and the context in which the written words are used.' " *Societe Nationale Industrielle Aerospatiale v. United States District Court for the Southern District of Iowa*, 482 U.S. 522, 534, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987); *accord Restatement (Third) of Foreign Relations Law of the United States*, § 325(a) (1987) (treaty is interpreted "in accordance with the ordinary meaning to be given to the terms of the agreement in their context and in light of its object and purpose").[40] The "context" of a term within a treaty includes *inter alia* the text and the preamble. *Restatement (Third) of For-*

---

the December 20, 2005 hearing. (Docket Entry # 23, p. 48; Docket Entry # 27, Ex. 1, ¶ 4).

**39.** The corresponding article in the 1973 Treaty barred extradition:

"(w)hen the person whose surrender is sought is being proceeded against or has been tried and discharged or punished in the territory of the requested Party for the offense for which his extradition is requested."

*Sindona v. Grant*, 619 F.2d 167, 176 (2nd Cir.1980) (quoting 1973 Treaty).

**40.** The above section is based upon article 31 of the Vienna Convention of the Law of Treaties, May 23, 1969, 1155 U.N.T.S. 331 ("Vienna Convention") which has not come into force in the United States. The Vienna

Convention nonetheless "represents generally accepted principles and the United States has also appeared willing to accept them despite differences of nuance and emphasis." *Restatement (Third) of Foreign Relations Law of the United States*, § 325, cmt. a (1987). Indeed, both Professor Bassiouni as well as the government's expert, Sara Criscitelli, Esq. ("Attorney Criscitelli"), quote and rely on section 325. Attorney Criscitelli is a former professor of International Criminal Law at George Washington University School of Law who, as a former Assistant Director of the Office of International Affairs in the Department of Justice's Criminal Division, participated in treaty negotiations and advised numerous federal prosecutors and foreign officials in extradition matters.

*eign Relations Law of the United States,* § 325 cmt. b (1987).

Unfortunately, not only does the text of the American and Italian versions employ different terms,[41] but the majority of cases addressing the scope of *non bis in idem* clauses involve treaties using the term "offense" as opposed to "act" or "fact." Michael Abbell and Bruno A. Ristau 4 *International Judicial Assistance* § 13–3–3(10) (1997) ("The few cases in which the scope of *non bis in idem* protection has been discussed have arisen under treaties using the *offense,* rather than *act,* terminology"). Even the cases interpreting the term "offense" refer to the absence of an international consensus or an "established solution" for the problem posed of ascertaining identity of offenses in applying a *non bis in idem* clause. *Sindona v. Grant,* 619 F.2d at 177 ("no established solution exists for the 'famous problem of identity of offenses for application of *non bis in idem*'"); *Elcock v. United States,* 80 F.Supp.2d at 79 (recognizing double jeopardy as "a widely accepted principle of criminal justice with roots in Roman law" but also noting "there is no international consensus on its precise meaning"); *In the Matter of the Extradition of Montiel,* 802 F.Supp. 773, 778 (E.D.N.Y.1992) (interpreting "offense" based language in *non bis in idem* clause and noting "the absence of international agreement on the scope of the concept"). Professor Bassiouni agrees with respect to the terms "same facts" or "same acts" in a *non bis in idem* clause. (Docket Entry # 27, Ex. 1, ¶ 4) ("there is no customary international law rule that bars extradition for the same facts or acts").

What *can* be said about the term "same acts" is that use of that term as opposed to the term "same offense" likely creates broader protection for the requested person. *Elcock v. United States,* 80 F.Supp.2d at 79 (dicta noting that, "it appears relatively clear that use of the term 'same acts' in a *non bis in idem* clause confers broader protection against extradition than a clause that uses the term 'same offense'"); Michael Abbell and Bruno A. Ristau 4 *International Judicial Assistance* § 13–2–4(19) (1997) ("use of the term 'acts' would appear to provide somewhat greater protection to the requested person than the term 'offense'"). Likewise, use of the term "same facts" in a *non bis in idem* clause also appears to create a broader protection for the requested person than use of the term "same offense." M. Cherif Bassiouni *International Extradition: United States Law and Practice,* ch. VII, § 4.3 (4th ed.2002).

The terms "same acts" and "same facts," like the term "same offense," *see Sindona v. Grant,* 619 F.2d at 177, can yield a range of obvious or ordinary meanings. "Same acts" could mean that the acts for which the requested person was convicted must be identical to the facts constituting the grounds for the extradition, i.e., the offenses charged by the requesting state, a position taken by the government's expert, Professor Massimo Starita ("Professor Starita"), a professor of International Law at the University of Palermo.[42] In a like

---

**41.** As noted *infra,* the *Restatement (Third) of Foreign Relations Law of the United States* (1987) provides a number of guides to the problem posed of interpreting treaties authenticated in more than one language. *See, e.g., Restatement (Third) of Foreign Relations Law of the United States* § 332 cmt. f (1987) ("The terms of the agreement are presumed to have the same meaning in each authentic text").

**42.** Although Professor Starita does not have as extensive a background in international extradition law as does Professor Bassiouni, his law degree from the Università degli Studi di Napoli shows an impressive 110 total grade points out of 110 possible points with special

vein, Professor Bassiouni acknowledges in his treatise that the similar phrase "same conduct" could be interpreted to mean "identical acts." M. Cherif Bassiouni *International Extradition: United States Law and Practice*, ch. VII, § 4.3 (4th ed.2002).[43] "Same acts" or "same facts" could also mean a series of acts or facts related by the design or the intent of the charged defendant or related by a close spatial relationship, including overlapping actors, time periods and transactions. "Same acts" or "same facts" could also mean the same evidence *and* material propositions of fact. *See* M. Cherif Bassiouni *International Extradition: United States Law and Practice*, ch. VII, § 4.3 (4th ed.2002) ("concept of same facts includes same evidence and material propositions of fact").

Professor Bassiouni, however, attests that article VI precludes extradition "for the same or substantially the same acts or facts for which that person is sought for extradition." (Docket Entry # 27, Ex. 1, ¶ 3). He repeatedly and predominantly avers that article VI precludes extradition when the relator has been convicted, acquitted or served the sentence for the "same, or substantially the same, facts." (Docket Entry # 34, Ex. 1, ¶¶ 2 & 8; Docket Entry # 27, Ex. 1, ¶¶ 4, 6, (d) & (e)). With all due respect to his expertise, the reasoning is suspect.

First, his reasoning that interpretation of the 1983 Treaty must begin with an appreciation of the changes in international extradition law and practice since the 1970s which the 1983 Treaty reflects is not convincing. (Docket Entry # 34, Ex. 1, ¶ 2). Not only should the interpretation begin with the language itself,[44] but the changes wrought primarily involved the dual criminality principle and the definition of extraditable offenses, a change which the Senate Report recognized but which the report did not recognize with respect to the *non bis in idem* clause.[45] Second, his reliance upon the adoption of a fact based approach to *non bis in idem* by the International Association of Penal Law in 2004 (Docket Entry # 34, Ex. 1, ¶ 3; Docket Entry # 27, ¶ 4) does not shed a great deal of light upon what the contracting parties to this treaty intended the *non bis in idem* provision to mean two decades earlier.

Third, in both his treatise and in a case in which he testified about a similar term, *United States v. Jurado–Rodriguez*, 907 F.Supp. 568 (E.D.N.Y.1995) (interpreting extradition decree involving the French term "faits" which translated lead to the different terms of "facts" and "acts"), Professor Bassiouni indicated that the term "faits," a term he translated at the December 20, 2005 hearing to mean "facts," equates to "material propositions of fact," *United States v. Jurado–Rodriguez*, 907 F.Supp. at 575; [46] M. Cherif Bassiouni *International Extradition: United States*

---

recognition for a dissertation involving treaties in international law.

**43.** Professor Bassiouni additionally suggests interpretations for "same conduct" as meaning "a series of acts related to each other by the scheme or intent of the actor" or "multiple acts committed at more than one place and at different times, but related by the actor's criminal design." M. Cherif Bassiouni *International Extradition: United States Law and Practice*, ch. VII, § 4.3 (4th ed.2002).

**44.** Elsewhere, Professor Bassiouni does correctly note a number of times that the plain language of a treaty is the starting point.

**45.** A more in depth discussion appears *infra*.

**46.** Although the court in *Jurado–Rodriguez* summarized Professor Bassiouni's opinions rather than reproducing the text, he agrees that the court's ruling was consistent with his opinion. (Docket Entry # 34, Ex. 1, ¶ fn. 4).

*Law and Practice,* ch. VII, § 4.3 (4th ed.2002) ("concept of same facts includes same evidence and material propositions of fact"); (Docket Entry # 27, Ex. 1, fn. 16); (Docket Entry # 27, fn. 4; " 'concept of same facts includes same evidence and material propositions of fact' "), as opposed to the same or substantially the same facts.[47] The court in *Jurado–Rodriguez,* which admittedly involved a different extradition decree and an interpretation of Luxemburg law thereby diminishing its precedential weight, equated the term "faits" to "what is referred to in our courts as 'material propositions of fact' or 'operative facts' or 'ultimate facts'—that is to say factual elements required to make out a prima facie case." *United States v. Jurado–Rodriguez,* 907 F.Supp. at 578 (citing *United States v. Shonubi,* 895 F.Supp. 460, 483–484 (E.D.N.Y.1995); Jerome Michael & Mortimer Adler, *The Trial of an Issue of Fact: I & II,* 34 Colum.L.Rev. 1224, 1252 & 1462 (1934); and John H. Mansfield et al., *Cases and Materials on Evidence,* ch. 1 (8th ed.1988)). In employing the definition "material propositions of fact," the court applied it to the facts by focusing upon the evidence that "would form the basis of proof of the elements of the charge." [48] *Id.* The definition of term facts in *Jurado–Rodriguez* and under one of the interpretations of the term by Professor Bassiouni in his treatise and in testimony in *Jurado–Rodriguez* thus equates the term with "material propositions of fact," an interpretation that is offense based. Finally, the definition used by Professor Bassiouni and urged by the relator is, coincidentally, similar to that discussed by the Second Circuit in *Sindona,* a decision to which this court now turns.

The Second Circuit in *Sindona* interpreted the prior language from the 1973 Treaty that included the term "offense" as opposed to "same acts" or "same facts." In interpreting the term "offense," [49] the court approved the lower court's adoption

---

**47.** Elsewhere in his treatise, Professor Bassiouni discusses "the problem of distinguishing between 'same facts' and 'same acts.' " M. Cherif Bassiouni *International Extradition: United States Law and Practice,* ch. VIII, § 4.3 (4th ed.2002). He explains that, "the term 'same facts' is broader and refers to all legally relevant facts to the charge for which the person was prosecuted, while 'same acts' refers to the elements of the offense charged." M. Cherif Bassiouni *International Extradition: United States Law and Practice,* ch. VIII, § 4.3 (4th ed.2002) (pointing out the problems associated with the use of different terms in different *non bis in idem* clauses).

**48.** The definition is similar to the definition employed by Professor Starita inasmuch as he equates the necessary identicality of facts to "the grounds for the extradition request by the Requesting State" and also describes the necessity of establishing that "the identifying factual elements coincide." (Docket Entry # 29, Ex. B, ¶ 4).

**49.** The court interpreted the term under the law of the requested party, the United States, because article X of the 1973 Treaty specified that "determination that extradition should or should not be granted shall be made in accordance with the law of the requested party." 26 U.S.T. 493, T.I.A.S. No. 8052 (1973). The 1983 Treaty replaces the 1973 Treaty and, notably, omits this language that broadly applied the requested party's laws to the issue of extradition. Although Professor Bassiouni attests that "Article VI of the 1984 Treaty specifies that it is the law of the requested party which applies" (Docket Entry # 27, Ex. 1, ¶ 6), the article does not contain such language. The drafters knew how to include such language, as evidenced in article VIII which requires the statute of limitations defense to be ascertained "under the laws of the Requesting Party." 35 U.S.T. 3023, T.I.A.S. No. 10,837 (1983). The drafters did not, however, include similar language in article VI. *See Elcock v. United States,* 80 F.Supp.2d at 77 ("[h]ad the parties intended that each would apply its own law in determining whether the requested extradition would violate double jeopardy principles, they could have clearly stated as much").

of "'a modified and more flexible test of whether the same conduct or transaction underlies the criminal charges in both transactions.'" *Sindona v. Grant*, 619 F.2d at 178. The court then analogized that test to Justice Brennan's view in *Ashe v. Swenson*, 397 U.S. 436, 453–454, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970) (concurring opinion) ("Double Jeopardy Clause requires the prosecution, except in most limited circumstances, to join at one trial all the charges against a defendant that grow out of a single criminal act, occurrence, episode, or transaction"), and the Department of Justice's Petite policy. The court defined the latter policy as precluding trial in a federal case "when there has been a state prosecution for substantially the same act or acts," which is similar to the language used by the relator's expert interpreting the different language of the 1983 Treaty.[50] Believing that the language of the *non bis in idem* clause in the 1973 Treaty was "at least as broad as that expressed" by Justice Brennan in *Ashe* "or in the Petite policy," the *Sindona* court then applied the clause and held that the crimes in the American indictment involving American banks and depositors were "on the periphery of the circle of crime charged by the Italian prosecutors," which was an Italian fraudulent bankruptcy charge involving the collapse of an Italian bank.[51] *Sindona v. Grant*, 619 F.2d at 179.

*Sindona* is distinguishable because the holding involved a comparison of different Italian and American crimes than those charged in the case at bar. Although the court noted that the Petite policy would apply "where the act of receiving a large marijuana shipment resulted in federal charges of conspiracy to distribute and state charges of possession with intent to deliver," the court also discounted this case law guidance as having limited scope because the Petite policy applies only to the United States. *Sindona v. Grant*, 619 F.2d at 179 (because "Petite policy rests largely in the discretion of the Department of Justice and applies only to the United States . . ., case law guidance on its scope is limited"). The foregoing example in *Sindona* is therefore, at best, dicta. In addition, as "an internal Justice Department policy," this circuit has "repeatedly held that the Petite policy does not confer substantive rights on criminal defendants." *United States v. Gary*, 74 F.3d 304, 313

---

**50.** The relator's other expert, Professor Alfonso M. Stile ("Professor Stile"), a full professor of criminal law at the University of Rome I "La Sapienza," similarly opines that the Preventive Custody Order entails what "seem to be the same (or substantially the same) facts on which [the relator] was convicted and sentenced" in the New York case. (Docket Entry # 27, Ex. 2).

**51.** Although the relator urges this court to adhere to the definition in *Sindona*, extradition is nonetheless proper even applying that definition. Here, the facts are not substantially the same as the *Sindona* court *applied* that phrase. The conspiracy in Count One is from 1975 to September 1992. In contrast, the article 75 conspiracy spans the time period of 1986 to November 1988. The goals of the article 75 conspiracy centered upon ship-

ments or refinements during that time period as opposed to the larger time period from 1975 to September 1992. The article 71 charge is even more temporally confined to the single 100 kilogram transaction with the aggravating circumstance of a criminal association targeting heroin shipments from 1979 to May 1980 as opposed to heroin and cocaine shipments from 1975 to September 1992. Relatively few of the defendants are overlapping as between racketeering act one and the article 75 and 71 charges. Consequently, as an alternative finding, application of the *Sindona* definition or Professor Bassiouni's "same or substantially the same facts" definition, does not require a refusal of the extradition request inasmuch as the Count One conspiracy is on the periphery of the article 71 and 75 charges.

(1st Cir.1996). Rather than interpret the *non bis in idem* clause in the 1983 Treaty, which admittedly contains language that is broader and more favorable to the relator than that interpreted and applied by the court in *Sindona*, as similar by analogy to the Petite policy, the more appropriate inquiry is to examine the language of the clause, the context of that language and then, if appropriate, turn to additional interpretive guides noted *infra* including the legislative history, any interpretation from the executive department and any subsequent practice adopted by the parties.

As noted above, the words "same acts" or "same facts" yield a number of plain or ordinary meanings. Examining the immediate context, the clause itself connects the preposition "for" and "same acts" or "same facts" with the terms "convicted, acquitted or pardoned, or has served the sentence imposed." The terms "convicted" "acquitted" and "served the sentence imposed" necessarily involve a prior crime or offense. The language in the body of the article therefore supports an interpretation that closely connects the same facts or same acts to the offense. Interpreting the

phrases to mean the same "material propositions of fact" or the coincidence of all "factual elements"[52] is consonant with the language in the body of the article.[53]

The heading of the article, "*Non Bis in Idem*," refers to a maxim "that is found throughout the civil law" as well as the common law.[54] *Bartkus v. Illinois*, 359 U.S. 121, 155 n. 9, 79 S.Ct. 676, 3 L.Ed.2d 684 (1958); *Sindona v. Grant*, 619 F.2d at 177. Accepting the premise that it is based "on the prohibition of prosecution for the same facts," the heading indicates not only an intention to bar prosecution for the same offense but also to bar prosecution for the "same facts," a concept that can encompass "*material* propositions of fact," M. Cherif Bassiouni *International Extradition: United States Law and Practice*, ch. VII, § 4.3 (4th ed.2002) (emphasis added), in other words, those propositions of fact that are material to or required to make out a prima facie case. *See generally United States v. Jurado–Rodriguez*, 907 F.Supp. at 578. Logically, you are not convicted or sentenced "for" an offense because you have red hair or are right handed.[55] Rather, you are convicted

**52.** Professor Starita avers that:
 While verifying whether the facts are the same, the judge must establish whether all the identifying factual elements coincide: in particular the principle (or principles) time and place of the commission; the material thing that is the object of the offense (for example, in case of narcotics trafficking, it must be the same shipment of drugs). Whenever the judge is not able to ascertain that the facts are identical, the ***non bis in idem*** principle shall not apply.
 (Docket Entry # 29, Ex. C); *see also* footnote no. 46.

**53.** It is not, however, the only possible or reasonable interpretation of the plain language of the body of the article.

**54.** The parties choice of this heading is, as correctly posited by the relator's expert (Docket Entry # 27, Ex. 1, ¶ 4), indicative of their intent and a factor to consider in the

course of deciphering the meaning and application of the clause.

**55.** The court in *Jurado–Rodriguez* aptly explained why a rule that excludes evidence or, in this instance, admitted non-material facts, "used in a prior prosecution in the sending state would be unworkable."
 To see why this is so, suppose defendant had been tried for the murder of X in the sending state and was extradited to be tried for the murder of Y in the receiving state. Evidence relevant in both countries might be that defendant was right handed (the knife wound in both cases showed a right handed wielder); he was extremely powerful (the blows struck in both cases required great strength); he had the same animus towards the deceased in both cases; and so on. Even the evidence of the murder of X might be used in proving that of Y if it showed the same modus operandi.

of an offense "for" engaging in the acts or facts that comprise the basis for the offense. Such facts or acts are what the law calls material facts. *Id.* at 578;[56] *see also In the Matter of the Extradition of Montiel Garcia*, 802 F.Supp. at 778 ("[t]he mere fact that the same evidence may be used in two prosecutions does not, however, mean that those prosecutions involve the same conduct").

Because the foregoing context may still fall short of providing a clear or single interpretation, this court turns to other interpretive guides. "[T]reaties are construed more liberally than private agreements, and to ascertain their meaning" a court "may look beyond the written words to the history of the treaty,[57] the negotiations, and the practical construction adopted by the parties." *Choctaw Nation of Indians v. United States*, 318 U.S. 423, 431–432, 63 S.Ct. 672, 87 L.Ed. 877 (1943); *accord Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 196, 119 S.Ct. 1187, 143 L.Ed.2d 270 (1999) (looking "beyond the written words to the larger context that frames the Treaty, including 'the history of the treaty, the negotiations, and the practical construction adopted by the parties' "); *El Al Israel Airlines, Ltd. v. Tseng*, 525 U.S. 155, 167, 119 S.Ct. 662, 142 L.Ed.2d 576 (1999) ("we have traditionally considered as aids to [a treaty's] interpretation the negotiating and drafting history (*travaux preparatoires*) and the postratification understanding of the contracting parties").

Senate reports are therefore "a proper interpretive guide." *Elcock v. United States*, 80 F.Supp.2d at 79. In this instance, the Senate Foreign Relations Committee Report to the full Senate ("the Senate Report") describes article VI and the *non bis in idem* clause as "*standard* United States extradition treaty practice."[58] S.Exec.Rep.No. 98–33, 98th Cong., 2nd Sess. (1984) (emphasis added). According to the treatise authored by the relator's expert, "Most United States treaties refer to the 'same offense' or substantially the same offense."[59] M. Cherif Bassiouni *In-*

---

*Id.*

**56.** Of course, the decision in *Jurado–Rodriguez* is not binding upon this court inasmuch as it interpreted a different extradition decree under Luxemburg law.

**57.** As previously noted, the history of this treaty is noteworthy because the 1973 Treaty used the word "offense" as opposed to the present use of the words "same act" in the English version and "same facts" in the Italian version. The Senate Report, as explained *infra*, however, demonstrates that the change in terms was not intended to produce a change from prior practice.

**58.** The entire description of article VI in the Senate Report appears in a single sentence which, in full, reads as follows:
*Article VI: Non Bis in Idem.*–This Article follows standard United States extradition treaty practice of barring extradition of the person sought when he has been in prior jeopardy in the requested country with respect to the same acts for which his extradi-

tion is being sought by the requesting country.
S.Exec.Rep.No. 98–33, 98th Cong., 2nd Sess. (1984).

**59.** In his most recent affidavit, Professor Bassiouni chastises Attorney Criscitelli for not examining the United States treaties with France and Luxembourg when she avers that " 'U.S. treaty practice assumes that there will be an offense-based and element-based approach to *non bis in idem*.' " (Docket Entry # 34, Ex. 1, ¶ 11). Professor Bassiouni attests that if Attorney Criscitelli had examined these treaties she would see that the 1983 Treaty "with Italy in[sic] not the only extradition treaty using the words same 'facts' in the *non bis in idem* provision." (Docket Entry # 34, Ex. 1, ¶ 11). In point of fact, however, the current extradition treaty with Luxembourg uses the term "offense" ("Extradition shall not be granted when the person sought has been found guilty, convicted or acquitted in the Requested State for the offense for which extradition is requested") as does the current

ternational Extradition: United States Law and Practice, ch. VIII, § 4.3 (4th ed.2002); accord Michael Abbell and Bruno A. Ristau 4 International Judicial Assistance § 13–2–4(19) (1997) ("[t]he great majority of these treaties," referring to treaties containing non bis in idem clauses, "bar extradition only if the requested person had been convicted or acquitted, or was being tried, in the requested country for the same 'offense' " and only "[a] few" bar extradition "for the same 'acts' ") (emphasis added); [60] see also Sindona v. Grant, 619 F.2d at 177 (noting that "[i]n most recent United States treaties, the formulation of" the double jeopardy clauses is similar to the 1973 Treaty and precludes extradition "when the person sought is being prosecuted or has been prosecuted 'for the offense for which extradition is requested' ") (emphasis added). "Standard" United States extradition treaty practice with respect to non bis in idem clauses, therefore, continued to preclude extradition where the requested person had been convicted of the same offense as opposed to the same facts or acts for which extradition was sought.

More broadly, the modern trend in extradition treaties, including the trend in treaties with the United States, is to turn away from listing a series of offenses as extraditable, M. Cherif Bassiouni International Extradition: United States Law and Practice, ch. VII, § 2 (4th ed.2002); Michael Abbell and Bruno A. Ristau 4

International Judicial Assistance § 13–2–4(2) (1997), a practice Professor Bassiouni refers to as parallel to the rejection of offense based language in the non bis in idem clause of the present treaty (Docket Entry # 27, Ex. 1, ¶ 5; Docket Entry # 34, Ex. 1, ¶ 2). The relator therefore argues that the provision applicable to extraditable offenses and dual criminality, found in article II of the present treaty and reflected in the Senate Report, must be read in conjunction with the non bis in idem clause in article VI as the two are parallel and confirm that the 1983 Treaty is fact based. (Docket Entry # 27, Ex. 1, ¶ 5; Docket Entry # 16, pp. 5–6; Docket Entry # 34, Ex. 1, ¶ 2). While this court agrees that the treaty should be read in context and as a whole, it cannot overlook the starkly different reasons for the clauses and the principles of dual criminality and extraditable offenses as distinct from the principle of non bis in idem.

"Dual criminality requires that an accused be extradited only if the alleged criminal conduct is considered criminal under the laws of both the surrendering and requesting nations." United States v. Saccoccia, 18 F.3d 795, 800 n. 6 (9th Cir.1994); M. Cherif Bassiouni International Extradition: United States Law and Practice, ch. VII, § 2 (4th ed.2002); (dual criminality "means that the crime charged in the requested state is also a crime in the requesting state"). Extraditable offenses, in

treaty with France. Extradition Treaty with Luxembourg, Oct. 1, 1996, U.S.-Lux., S. Treaty Doc. No. 105–10 (1997); Extradition Treaty with France, April 23, 1996, U.S.-Fr., S. Treaty Doc. No. 105–13 (1997). Both treaties, which entered into force in February 2002, additionally provide that, "Extradition shall not be refused" or that "Extradition shall not be precluded" on the basis that the requested state has decided not to prosecute the requested person "for the acts for which extradition is requested." Id. Thus, the non bis in idem

clauses in these treaties do not use the words "same 'facts.' "

60. To support the latter proposition that only a few treaties employ the term "for the same acts," Abbell and Ristau cite only to a single treaty, that being a prior treaty between the United States and France. Accord Sindona v. Grant, 619 F.2d 167, 177 (2nd Cir.1980) (noting the French treaty as "a notable exception" to the voluminous list of treaties the court cited that use the term "offense[s]").

turn, refers to "those offenses that are deemed subject to extradition." *Id.* Extradition treaties either list a series of extraditable offenses or designate a formula, typically based upon a minimum penalty. *See* M. Cherif Bassiouni *International Extradition: United States Law and Practice,* ch. VII, § 3.3 (4th ed.2002) (methods to determine extraditable offenses fall into either the enumerative or eliminative method). Use of a formula based method avoids lengthy treaty negotiations "by eliminating the need for negotiators to spend endless hours trying to reach agreement on the precise terminology required to express particular offenses." Michael Abbell and Bruno A. Ristau 4 *International Judicial Assistance* § 13–2–4(2) (1997). Another basis for preferring a formula based method is that it avoids the need to renegotiate a supplementary extradition treaty for the sole purpose of including an additional offense in the list of extraditable offenses. *Id.*

The 1983 Treaty is no exception to this modern trend.[61] Paragraph one of article II employs a formula method defining extraditable offenses as those offenses punishable by more than one year incarceration.[62] Paragraph two of article II then expressly notes as extraditable offenses "[a]ny type of association to commit offenses described in paragraph one ..., as provided by the laws of Italy, and conspir-

acy to commit an offense described in paragraph one ..., as provided by the laws of the United States." 35 U.S.T. 3023, T.I.A.S. No. 10,837 (1983). In describing the first paragraph of article II, the Senate Report explains that, "Paragraph one of this Article also follows the policy set in all other modern United States extradition treaties by making it clear that it is the nature of the underlying conduct; not its denomination in each country, that is critical to the application of the dual criminality principle." S.Exec. Rep.No. 98–33, 98th Cong., 2nd Sess. (1984). In describing the second paragraph of article II, the Senate Report notes that, "We were assured by the Italian negotiators that the association offenses" in RICO were "sufficiently analogous to Italian illicit association offenses to be extraditable under the Treaty."[63] *Id.*

The relator quotes and relies upon both of these statements from the Senate Report and then analogizes them to the purportedly similar fact or conduct based change in article VI. While this court agrees that the language of article VI must be read in the context of the entire treaty, it would be a mistake to over emphasize the parallelism between the extraditable offense article and the double jeopardy or *non bis in idem* article.

First, the reasons for the extraditable offense article and the *non bis in idem*

---

**61.** Article II in the 1983 Treaty was a change from the list of 30 offenses in article II of the 1973 Treaty. (Docket Entry # 27, Ex. 1, ¶ 5).

**62.** The language reads as follows:

*Extraditable Offenses*

1. An offense, however denominated, shall be an extraditable offense only if it is punishable under the laws of both Contracting Parties by deprivation of liberty for a period of more than one year or by a more severe penalty. When the request for extradition relates to a person who has been sentenced, extradition shall be granted only

if the duration of the penalty still to be served amounts to at least six months.
35 U.S.T. 3023, T.I.A.S. No. 10,837 (1983).

**63.** This court has no doubt that the illicit association offenses charged in the arrest warrant under article 75 are similar to the RICO conspiracy offense under 18 U.S.C. § 1962(d) in Count One of the New York case for purposes of constituting an extraditable offense. The inclusion of a separate paragraph for conspiracies also shows an intent of the parties to facilitate extradition involving conspiracy crimes.

article are not the same. The former ensures that the crime for which extradition is sought is also a crime in the requested state. The latter arises from the "fundamental norm of *non bis in idem*," *Sindona v. Grant*, 619 F.2d at 177 (citing M. Chief Bassiouni *International Extradition and World Public Order*, pp. 452–59 (1974)), which "embodies the principle that no one shall be twice placed in jeopardy for the same offense." M. Chief Bassiouni *International Extradition and World Public Order*, p. 452 (1974).

Second, the Senate Report's description of article II makes it apparent that the committee was well aware of the change to the 1983 Treaty created by dispensing with the list of extraditable offenses. S.Exec.Rep.No. 98–33, 98th Cong., 2nd Sess. (1984) ("*Article II: Extraditable Offenses.*—This Treaty, like the recently negotiated treaties with Costa Rica ..., dispenses with the list of offenses contained in previous United States extradition treaties" and, "Instead of listing each offense ..., the Treaty adopts the prevailing modern international practice"). In striking contrast to this description of article II as changing existing practice, the Senate Report describes article VI as adhering to existing practice because the article follows "standard United States extradition treaty practice." [64] *Id.* The Senate Report therefore clarifies that article VI was intended to foster an offense based interpretation of the terms.

An additional interpretive guide other than the Senate Report is "the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement," a meaning that

"is entitled to great weight." *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. at 184–185, 102 S.Ct. 2374; *accord Charlton v. Kelly*, 229 U.S. 447, 468, 33 S.Ct. 945, 57 L.Ed. 1274 (1913) ("construction of a treaty by the political department of the Government, while not conclusive upon a court called upon to construe such a treaty in a matter involving personal rights, is nevertheless of much weight"); *United States v. Kin–Hong*, 110 F.3d 103, 110 (1st Cir.1997) ("executive branch's construction of a treaty, although not binding upon the courts, is entitled to great weight"); *Elcock v. United States*, 80 F.Supp.2d at 79 ("executive branch's construction of a treaty, although not binding on the courts, is entitled to great weight"). In the case at bar, the letter of transmittal from Secretary of State George Schultz to President Ronald Reagan is therefore entitled to "great weight." *Croll v. Croll*, 229 F.3d 133, 142 (2nd Cir.2000) (finding Secretary Schultz's view of the treaty set forth in his letter of submittal to President Reagan "is entitled to 'great weight' "). Although the letter did not clarify the reason for the change of the term from the 1973 Treaty, it did summarize article VI as offense based. The relevant portion states that, "Article 6 provides that extradition shall be denied when the person sought has been in *jeopardy* in the requested State for the same *offense.*" (Docket Entry # 17, Ex. A; emphasis added).

In addition, President Regan primarily viewed the treaty as a means to facilitate prosecution of narcotics conspiracies. His relatively brief letter of submittal to the Senate emphasizes that, "The treaty will

---

**64.** In addition, no mention was made in the Senate Report of the decision in *Sindona*. Furthermore, the Senate Report did not hesitate to mention a case when it deemed the case relevant to explain the language of an article. Thus, in the course of discussing article XII, the Senate Report explains that the language now "removes the impediment to provisional arrest under the [1973] treaty, discussed in *Caltagirone v. Grant*, 629 F.2d 739 (2nd Cir.1980)." *Id.*

facilitate United States efforts to prosecute narcotics conspiracies by expressly providing that conspiracies ... constitute extraditable offenses." [65] (Docket Entry # 17, Ex. A). Together, this executive interpretation evidences an offense based interpretation of precluding extradition where a person is placed in jeopardy for the same offense and an intention to foster or promote extradition for narcotics conspiracies such as for the article 75 charges in the case at bar.

As previously noted, the Italian version employs the term "same facts." Italian *non bis in idem* law, as derived from article 649 of the Italian Criminal Code, is also fact based.[66] Article 649 provides that, "a defendant who has been acquitted or convicted with a ruling or sentence that has become final may not be subjected to criminal proceedings again for the same act,[67] even if there is a difference in the designation of the title, the degree or for the circumstances." (Docket Entry # 29, Ex. A; reference to article 648 omitted). Italian law, however, strictly applies the *non bis in idem* rule. (Docket Entry # 29, Ex. C, ¶ 4). Thus, it requires that the acts for which the prior offense or sentence was imposed be "identical to the facts constituting the grounds for the extradition request." (Docket Entry # 29, Ex. C, ¶ 4). In application, the rule requires the judge to identify whether the factual elements such as the principles, the

time and place of the crime's commission and the material object[s] of the offense coincide. *Id.*

As previously explained, the term "acts" in the English version taken in context and also considering the meaning placed upon the article by the Senate Report and by the executive branch supports an offense based interpretation of the term as meaning the same material propositions of fact or the same acts that comprise the basis for the offense.[68] Presuming that the terms "same facts" in the Italian version and the "same acts" in the English version have the same meaning, *Restatement (Third) of Foreign Relations Law of the United States* § 325, cmt. f (1987) ("terms of the agreement are presumed to have the same meaning in each authentic text"), inures to an interpretation of the terms as meaning the same material propositions of fact or, similarly, the same identical facts that comprise the grounds or basis for the offense.

█ Even if this court determined that the intended meanings afforded the terms in the 1983 Treaty could not be reconciled, the same result obtains by resort to the well established principle that favors a liberality of construction. In other words, if this court could not reconcile the foregoing intended meaning in the English version with the Italian intended meaning, as put

65. The Senate Report echos this concern. S.Exec.Rep.No. 98–33, 98th Cong., 2nd Sess. (1984) ("Treaty is intended to facilitate U.S. efforts to prosecute narcotics conspiracies").

66. Neither the government nor the relator provided *travaux preparatoires* for the implementation and adoption of the 1983 treaty in Italy.

67. A certified Italian translator averred that the above translation of article 649 was true and accurate. Even if this court did not accept the translator's translation of the Ital-

ian word "fatto" as act and, instead, accepted Professor Bassiouni's translation of that word as "fact" (Docket Entry # 23, p. 78), this court still adheres to the interpretation of the *non bis in idem* rule as that put forth by Professor Starita (Docket Entry # 29, Ex. B, ¶ 4).

68. Given the executive branch's interpretation, the term could also mean simply "same offense" which would yield the same result of extraditing the relator on the article 71 charge.

forth by Professor Starita, where two conflicting terms appear in an extradition treaty the more liberal interpretation that effectuates the apparent intention of the parties prevails.[69] The more liberal interpretation typically favors the relator's extradition inasmuch as the purpose of an extradition treaty is to facilitate extradition. *See Factor v. Laubenheimer,* 290 U.S. at 293, 54 S.Ct. 191; *United States v. Kin–Hong,* 110 F.3d at 110 (quoting *Factor* and explaining that, "extradition treaties, unlike criminal statutes, are to be construed liberally in favor of enforcement because they are 'in the interest of justice and friendly international relations' "); *Brauch v. Raiche,* 618 F.2d 843, 850 (1st Cir.1980); *Elcock v. United States,* 80 F.Supp.2d at 83 (recognizing principle of construction applicable to extradition treaties is "the preference for constructions that promote extradition"); M. Cherif Bassiouni *International Extradition: United States Law and Practice,* ch. II, § 5.3.3(2) (4th ed. 2002) ("Where a provision is capable of two interpretations either of which would comport with the other terms of the treaty, the judiciary will choose that construction which is more liberal and which would permit the relator's extradition, because the purpose of the treaty is to facilitate extradition between the parties to the treaty"); *accord Restatement (Third) of Foreign Relations Law of the United States* § 325 cmt. f (1987) ("when a comparison of the authentic texts discloses a difference of meaning ..., the meaning that best reconciles the texts, having regard to the object and purposes of the international agreement").[70]

■ Applying the "material propositions of fact" interpretation of "same acts" or "same facts" to the prosecutions under articles 75 and 71, neither are barred under the *non bis in idem* clause.[71] Indeed, neither are barred using a variety of interpretations including the same or substantially the same facts interpretation[72] as well as the identical facts interpretation indicated by the government's expert (Docket Entry # 29, Ex. C, ¶ 4).

The article 75 conspiracy spanned a much shorter time period and, with a few exceptions, involved different defendants than the RICO conspiracy in Count One of the New York case. Whereas the article 75 conspiracy focuses upon heroin shipments, with the preferred channel of heroin for the relator being Torretta, and cocaine shipments into Florida from South America between 1986 and November 1988, the New York conspiracy encompassed heroin and cocaine transactions from 1975 to 1992 and largely, but not completely, different shipments of narcotics. The racketeering enterprise also centered its activities around 18th Avenue in Brooklyn as opposed to primarily Torretta and Palermo. Furthermore, not only did

---

69. Regardless, in point of fact the application of both versions yields the same result of engendering the relator's extradition. The admitted material propositions of fact in the New York case are not the same as the corresponding facts in the charged article 71 and 75 offenses. Likewise, the factual elements, such as the principles, time and place of commission and the material objects, are not the same in the two proceedings.

70. Professor Bassiouni likewise acknowledges in this case that, "[T]here is a presumption of liberality in favor of interpreting the terms of extradition treaties in order to achieve the overall purposes of extradition as between two contracting states." (Docket Entry # 17, Ex. 1, ¶ 3).

71. Having exhaustively discussed the differences, as well as the similarities, between the Italian charges and the New York case as applied to the relator, this summary simply highlights the more noteworthy differences.

72. *See* footnote number 49.

the New York conspiracy involve largely different co-defendants and a different time period, it included a wealth of overt acts distinct from the facts in the arrest warrant.[73]

Turning to the article 71 charge, the New York case involved a broad conspiracy spanning more than a decade and 81 subparagraphs of overt acts, only two paragraphs of which explicitly involve the underlying narcotics possession charge that is the subject of the article 71 prosecution. While the 100 kilograms manufactured in Baida provides the central focus in the article 71 prosecution, aggravated by the conspiracy involving those facts, the New York prosecution involved a much broader conspiracy both in terms of the time period involved and the means employed. See, e.g., Gusikoff v. United States, 620 F.2d 459, 463–464 (5th Cir. 1980). Directly referenced in only two of the 81 subparagraphs depicting the overt acts, the 100 kilogram shipment was not a focal point of the section 1962(d) conspiracy to which the relator pled guilty but, instead, lay on the periphery of a much larger and broader criminal enterprise. In addition, unlike the section 1962(d) conspiracy which involved both heroin and cocaine, the criminal association that aggravates the article 71 charge involved only heroin.

 Furthermore, the article 71 charge against the relator is grounded upon the material facts of possessing and exporting the 100 kilogram shipment of heroin manufactured in Baida. These facts, however, were not material to the section 1962(d) conspiracy. Thus, it is true that the shipment at issue in the Italian article 71 charge coincides with two of the 81 subparagraphs of overt acts pled in the New York case.[74] It is also true that by pleading guilty to Count One in the New York case, the relator admitted to participating in a RICO conspiracy, including the facts in racketeering act one which incorporated the overt acts in Count Three. See United States ex rel. Boucher v. Reincke, 341 F.2d 977, 980 (2nd Cir. 1965) ("[b]y pleading guilty [a defendant] admitted all the facts alleged in the information and waived all non-jurisdictional defects and defenses"). The elements of a RICO conspiracy, however, do not require proof of an overt act, United States v. Salmonese, 352 F.3d at 620, or that the relator personally commit the overt act or the crime directly. See United States v. Zichettello, 208 F.3d 72, 99 (2nd Cir.2000) (" 'defendant can be guilty of conspiring to violate a law, even if he is not among the class of persons who could commit the crime directly' "). Instead, in order to prove a RICO conspiracy, the defendant must " 'embrace[ ] the objective of the alleged conspiracy,' and agree[ ] to commit predicate acts in furtherance thereof." United States v. Zichettello, 208 F.3d at 99 (internal ellipses omitted). Thus, any admission on the part of the relator to committing an overt act was not a material proposition of fact in the New York case. In contrast to the Italian prosecution under article 71, the success of or the relator's actual participation in the underlying venture of manufacturing, buying, transporting or importing the 100 kilograms of

73. Alternatively or in addition thereto, overt acts are not required for a section 1962(d) RICO conspiracy and, as such, are not material propositions of facts or acts.

74. In addition to the two subparagraphs, an additional subparagraph refers to a meeting in early 1979 at the Baby Luna restaurant in Sicily. An additional few subparagraphs of the pled overt acts involve the relator's heroin activities and connections to Milan and the 40 kilogram shipment.

heroin refined in Baida was not required to prove the RICO conspiracy.

Finally, the admissions as to the predicate act, racketeering act one,[75] see Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 25 (2nd Cir.1990) (RICO conspiracy targets "only predicate acts catalogued under section 1961(1)"), which incorporated the objects, means and overt acts of Count Three, concern acts or facts that are far greater in number, scope and kind than the narcotics crimes involved in either the arrest warrant or the Preventive Order and the coinciding report.

In sum, in the New York case the relator was not convicted "for" the "same acts" or the "same facts" within the meaning of the 1983 Treaty as those in the article 75 and 71 charges. Because the same acts or same facts were not involved, the relator was also not "sentenced" for the same acts or facts. The relator's reliance on a presentence report, that was not the actual PSR used by the sentencing judge, is misplaced. As previously explained, the trial judge sentenced the relator under Count One only and only for what was allocuted. The relator's counsel emphasized the limited nature of the plea at the plea hearing and the trial judge carried this distinction forward at the sentencing hearing.

Thus, although the relator accurately notes similarities between the amounts of heroin in Count Three and the base level offense calculation in the March 1994 presentence report (Docket Entry # 27, fn. 7 & 8), the fact remains that the trial judge unequivocally sentenced the relator under Count One only and only for what was allocuted. He did not rely on the PSR in imposing the 15 year sentence. Indeed, he made certain the record would reflect this by stating the following:

... They [referring to defense counsel] don't want to be in a position where they have waived any objection to the summary contained in the [June 10, 1994] presentence report, so that I am finding today they have not waived their objections, and they are protected for whatever future purposes issues might come up that are unpredictable. But it is important that the record is protected for defense counsel so that we have allocutions by the defendants which the government, the court and the probation officer are all well aware of, and I again say that they suffice for my purposes at the time of sentencing.

I am going to accept the invitation of the government to go one step further and indicate that to the extent the summaries in the present presentence report goes beyond the allocutions, that I do not find it necessary to rely on the factual background set forth for purposes of the sentencing, ..., for purposes of this hearing I am going to rely on what was contained in the allocutions of the defendants.

(Docket Entry # 19, Ex. B, p. 10). Accordingly, the relator's alternative argument (Docket Entry # 27, ¶ I(C)) that the relator has served the sentence imposed for the same acts or facts for which extradition is requested is unavailing.

The relator additionally argues that, if this court accepts the government's argument that the relator " 'was convicted and sentenced to only the 40 kilograms of heroin that was seized at the airport in Milan,' " then "it follows that extradition should nonetheless be declined under Article VI because Gambino should be deemed to have been 'acquitted' of the facts alleged

---

**75.** The Indictment begins the list of the racketeering acts with the explanation that the acts of racketeering that form a "pattern of racketeering activity, as defined by Sections 1961(1) and 1961(5)," are as follows. (Docket Entry # 19, Ex. A, ¶ 14).

in Count Three, which are the 'same facts' for which extradition is sought." (Docket Entry # 27, ¶ I(D)). This court, however, did not accept the government's argument that the relator was convicted and sentenced only for the 40 kilograms of heroin seized in Milan. To the contrary, this court accepted the relator's contention that racketeering act one incorporated all of the overt acts in Count Three including the 100 kilogram shipment noted in subparagraph 48(5). The premise for the relator's acquittal argument is therefore absent.

Second, the dismissals in the New York case did not involve the "same facts" or the "same acts" for which Italy seeks the relator's extradition. Italy seeks extradition on facts that are far more circumscribed and limited in terms of place, time period, co-defendants, narcotics shipments and material or legally relevant facts than those at issue in the dismissed counts. The only narcotics trafficking offense in the Indictment, the dismissed Count Five, while a similar offense to article 71, involved a heroin shipment in March 1988 as opposed to the 100 kilograms of heroin manufactured in Baida in 1979.

In a related argument, the relator contends it is "fundamentally unfair" for the government to facilitate the relator's extradition when it is legally barred from taking further prosecutorial action on its own. (Docket Entry # 27, ¶ I(D)). At the time the government agreed to the plea agreement, however, it was not barred from prosecuting the relator for the underlying narcotics trafficking offense for the 100 kilogram shipment of heroin into the United States in 1979 and 1980, *see United States v. Felix,* 503 U.S. 378, 389–392, 112 S.Ct. 1377, 118 L.Ed.2d 25 (1992); *Gusikoff v. United States,* 620 F.2d at 464, or necessarily for a conspiracy that is far shorter in duration involving largely but

not exclusively different co-defendants. *See United States v. Jurado–Rodriguez,* 907 F.Supp. at 580.

As a final matter, the relator asserts that an unpublished California federal case, *In the Matter of the Extradition of Rosario Gambino,* Case Number 01–02958 DT (RZ), in the United States District Court in the Central District of California ("the California case") (Docket Entry # 17, Ex. H) "is factually and legally similar to this case." (Docket Entry # 27, p. 16; Docket Entry # 34). Professor Bassiouni characterizes the case as "involving the same or substantially the same facts but involving another defendant." (Docket Entry # 27, Ex. 1, ¶ 10). Notwithstanding the relator's arguments, the California case is distinguishable.

First, any precedential weight is diminished by the fact that it is an unpublished decision. Second, this court adhered to the principle cited in the decision that, "The Court starts with the language of the treaty itself." (Docket Entry # 17, Ex. H, p. 8). Turning to the portion of the opinion repeatedly quoted by the relator, this court agrees that the 1983 Treaty "does not protect only against acquittals or convictions for the same *offense;* the protection extends to *acts* as well." (Docket Entry # 17, Ex. H, p. 23). Recognizing the change in terminology from the 1973 Treaty, this court focused on the interpretation of the term "same acts" or "same facts," concluding, based on the language, its context, the Senate Report, executive branch statements and other interpretive guides, that this language was intended to mean "material propositions of fact." This court further concluded that even if the language meant "the same or substantially the same facts," the article 71 and 75 charges were not based upon the same or

substantially the same facts.[76]

Second, the Italian convictions and the acquittals in the United States District Court in the Eastern District of New York ("American case") at issue in the California case were notably a great deal more factually similar than the article 75 and 71 charges and the New York case in these proceedings. In the California case, the government conceded that the Italian convictions for criminal conspiracy and association concerned some of the same acts as the American case and were therefore barred under the *non bis in idem* clause of the 1983 Treaty. This left only the remaining Italian conviction of possession and exportation of heroin on March 18, 1980, for the court to address. The conspiracy to which the California court compared the Italian possession conviction spanned a time period of August 1, 1979 "through at least March 1980 and the Relator participated in that conspiracy."[77] (Docket Entry # 17, Ex. H, p. 23). In addition, one of the superceding indictments in the American case included Emanuele Adamita as a conspirator and charged Paul Zinerco, John Eggito and Frank Rolli and "[t]he Italian case against Relator rested first on meetings held between Adamita and Relator, on the one hand, and Rolli, Egitto[78] and Zinerco on the other, indicating an association to commit crimes targeted on drug trafficking." (Docket Entry # 17, Ex. H, p. 24). Accordingly, the short eight month time period and the greater overlap in parties factually distinguishes the California case from the case at bar. Here, the New York case covered a much longer time period than the time period covered in the Italian proceedings and a more dissimilar group of charged defendants than in the Italian proceedings.

In sum, the *non bis in idem* clause does not prevent the relator's extradition to Italy to face the article 75 and 71 charges set forth in the extradition papers.

## II. Summary of Facts and Probable Cause for Arrest Warrant

The relator maintains there is an absence of probable cause to support the article 75 charges in the arrest warrant. He also submits that the record fails to contain a "summary of facts" with respect to article 75 charges thereby contravening article X(3)(b) of the 1983 Treaty.

Article X(3) of the 1983 Treaty sets forth the required documentation that must accompany an extradition request where, as here, the request "relates to a person who has not yet been convicted" in the requesting state. 35 U.S.T. 3023, T.I.A.S. No. 10,837 (1983). Article X(3) not only requires "(a) a certified copy of the arrest warrant or any order having similar effect" but also "(b) a summary of the facts of the case, of the relevant evidence and of the conclusions reached, providing a reasonable basis to believe that the person sought committed the offense for which extradition is requested." *Id.* The relator submits that there is no "summary of facts" within the meaning of article X(3)(b) for the article 75 charges in the arrest warrant.

---

**76.** This court additionally concluded that the article 71 and 75 charges were not based on the same facts or the same acts in the event the language is interpreted to mean identical facts as posited by Professor Starita.

**77.** After much discussion, the California court allowed the jury to consider the time period

following the August 1 to September 30, 1979 conspiracy charged in the relevant Indictment.

**78.** Eggitto's name is spelled differently at various places in the opinion.

As explained in the Senate Report, the purpose of the summary of facts is to provide sufficient information for a finding of probable cause. The report explains that with respect to persons charged in Italy, article X(3)(b) requires that "Italy need only submit a summary of the relevant evidence, written by an Italian magistrate, providing a reasonable basis (i.e., probable cause) to believe that the person sought committed the offense for which extradition is requested." S.Exec.Rep.No. 98–33, 98th Cong., 2nd Sess. (1984). The Italian authorities must therefore "provide sufficient documentation to demonstrate probable cause . . . ." *Id.*

In addition to the necessary documentation, the extraditing court must find "the evidence sufficient to sustain the charge under the provisions of the proper treaty." 18 U.S.C. § 3184; *United States v. Kin–Hong*, 110 F.3d at 117 ("purpose of the evidentiary portion of the extradition hearing is to determine whether the United States, on behalf of the requesting government, has produced sufficient evidence to hold the person for trial"); *see Collins v. Loisel*, 259 U.S. 309, 314, 42 S.Ct. 469, 66 L.Ed. 956 (1922) ("function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction"); *see also Neely v. Henkel*, 180 U.S. 109, 123, 21 S.Ct. 302, 45 L.Ed. 448 (1901) (extradition requires a finding of probable cause that the requested person committed the offenses for which extradition is sought is required). The 1983 Treaty, in turn, requires, as stated above, "a reasonable basis to believe that the person sought committed the offense for which extradition is requested." 35 U.S.T. 3023, T.I.A.S. No. 10,837 (1983). The accompanying Senate Report is, again, illuminating. It explains that:

> The term "reasonable basis" is used because the term "probable cause" has no legal meaning in Italian jurisprudence. However, the difference in terminology is not intended to change United States extradition treaty practice which has uniformly required that our treaty partners, in requesting the extradition of a person charged by them, provide sufficient documentation to demonstrate probable cause to believe that the crime for which extradition is sought was committed and that the person sought committed it.

S.Exec.Rep.No. 98–33, 98th Cong., 2nd Sess. (1984).

■ The probable cause determination "may rest entirely on hearsay," *In Re Extradition of Ryan*, 360 F.Supp. 270, 273 (E.D.N.Y.1973); *accord United States v. Kin–Hong*, 110 F.3d at 120 (same); *see also Barapind v. Enomoto*, 360 F.3d 1061, 1070 (9th Cir.2004) ("'uncorroborated witness statements can by themselves establish probable cause'"), and "[d]epositions, warrants or other papers" are admissible at the hearing if properly authenticated and admissible in the requesting state.[79]

---

**79.** Not all evidence is properly admitted, however, at an extradition hearing. As explained by the First Circuit in *Koskotas:*

> Although it is within the discretion of the district court to permit the relator to offer limited, explanatory evidence relating to the charges against him, contradictory evidence properly may be excluded. While the line between "contradictory" and "explanatory" evidence is not sharply drawn, the purpose of permitting explanatory evidence is to afford the relator "the opportunity to present reasonably clear-cut proof which would be of limited scope and have some reasonable chance of negating a showing of probable cause."

18 U.S.C. § 3190; *Restatement (Third) of Foreign Relations Law of the United States* § 478 cmt. b (1987). That said, however, the probable cause requirement is not "toothless." *United States v. Kin–Hong*, 110 F.3d at 121. Thus, "[i]nherent in the probable cause standard is the necessity of a determination that the evidence is both sufficiently reliable and of sufficient weight to warrant the conclusion." *Id.* Moreover, all of the "evidence does not have the same importance even if it is authentic and admissible." *Id.* at 121 (further noting, as an example, that a confession obtained by duress is inherently unreliable and therefore "given little weight").

▇ Although the 16 page decision in the arrest warrant provides a factual summary which adequately clarifies the scope of the article 75 charges for purposes of comparing the charges to the conviction and sentencing in the New York case under the *non bis in idem* article, the summary does not provide sufficient information to find probable cause that the relator committed the article 75 offenses. Notably, the source of the information tying the relator to the criminal association is only generally identified as "inquiries carried out by the bodies of American police" or "thanks to this proceeding." (Docket Entry # 18, Ex. A, Arrest Warrant, p. 28). The presence of the criminal association and the focal point of Torretta as a turnover point for the heroin shipments to the United States stem from inquiries by the Italian police and undisclosed statements made by "co-defendant Allegro Salvatore." *Id.* at 20. Although accomplice statements given to police which incriminate the speaker provide reliability, the extradition papers fail to contain any summary or

otherwise identify the nature of the statements made by Allegro Salvatore and connect those statements to the relator. *Cf. In the Matter of the Extradition of Singh*, 170 F.Supp.2d 982, 1015 (E.D.Ca.2001) ("Chief Sharma's affidavit reports that each witness identified Barapind from personal knowledge"), *aff'd in part and rev'd in part on other grounds and remanded sub nom. Barapind v. Enomoto*, 400 F.3d 744 (9th Cir.2005); *see, e.g., In the Matter of the Extradition of Mainero*, 990 F.Supp. 1208, 1228–1229 (S.D.Ca.1997) ("testimony of the various witnesses, including Miranda and Alejandro[,] provide competent evidence for an assessment of probable cause to believe that the crime of criminal association (conspiracy) has been committed and that Respondent is involved therein").

Other than his extensive experience in Italian criminal law, the source of Dr. Pignatone's averments about the relator directing and organizing the conspiracy with the main goal being transporting the heroin shipments from Torretta to the United States, is unclear. In the face of the relator's argument that the source and reliability of the information in the arrest warrant is insufficient, more is needed for a showing of probable cause. *See, e.g., In the Matter of Extradition of Powell*, 4 F.Supp.2d 945, 954–955 (S.D.Ca.1998) (rejecting allegation that affidavit was conclusory and insufficient to establish probable cause inasmuch as affidavit stated it " 'is based on my personal observations as well as information provided to me by officers and agents of the United State's Immigration and Naturalization Service, the United States Custom's Service, the Bureau of Alcohol, Tobacco, and Firearms, the Cali-

*Koskotas v. Roche*, 931 F.2d 169, 175 (1st Cir.1991); *see Charlton v. Kelly*, 229 U.S. 447, 461–462, 33 S.Ct. 945, 57 L.Ed. 1274 (1913).

fornia Department of Corrections, the San Diego Sheriff's Department and the Escondido Police Department' "); *Koskotas v. Roche*, 931 F.2d at 176 (probable cause for forgery charge "based not only on the alleged forgery but on twelve sworn affidavits attesting that Koskotas caused the purported Merrill Lynch document, reflecting wire transfers in the names of various persons in the Greek government, to be delivered to the Greek government").

The failure at this juncture to produce sufficient evidence of probable cause does not prevent the government from providing additional documentation and renewing the extradition request for the article 75 charges. As provided in article XI of the 1983 Treaty, if the documentation submitted is incomplete or otherwise fails to conform to the 1983 Treaty requirements, the government may submit a "new request" for extradition and deliver "the additional documentation ... at a later date." 35 U.S.T. 3023, T.I.A.S. No. 10,837 (1983); *see generally* Michael Abbell and Bruno A. Ristau 4 *International Judicial Assistance* § 13–2–5(6) (1997) (discussing requests for and provisions of supplementary documentation).

■ Although insufficient at this stage to sustain the article 75 charges and provide a reasonable basis to believe that the relator committed the article 75 charged offenses, the evidence is more than sufficient to sustain the article 71 charge under the 1983 Treaty within the meaning of section 3184. The facts in the Preventive Order and the report provide a reasonable basis to believe that the relator committed the charged article 71 offense.

### III. *Validity of Arrest Warrant and Preventive Order*

■ The relator also argues that the Preventive Order is no longer valid having expired two years after its 1990 issuance. He further asserts that the arrest warrant is not valid.[80] The evolution of this argument in the relator's filings reveals its present weakness.

Article I, cited as a basis for the relator's argument (Docket Entry # 27, ¶ II), states "the basic obligation" of the contracting parties to extradite to each other persons who have been charged with extraditable offenses in accordance with the terms of the 1983 Treaty. S.Exec.Rep.No. 98–33, 98th Cong., 2nd Sess. (1984). It provides that, "The Contracting Parties agree to extradite to each other, pursuant to the provisions of this Treaty, persons whom the authorities of the Requesting Party have charged with or found guilty of an extraditable offense." 35 U.S.T. 3023, T.I.A.S. No. 10,837 (1983). Both the article 75 and 71 charges are extraditable offenses within the meaning of the 1983 Treaty inasmuch as they are punishable by terms of imprisonment of more than one year. The arrest warrant and the Preventive Order also "charged" the relator with these extraditable offenses.

More to the point, article X(3)(a) requires an extradition request to include "a certified copy of the arrest warrant or any order having similar effect." 35 U.S.T. 3023, T.I.A.S. No. 10,837 (1983). To support the relator's argument of the absence of a valid charging instrument, the relator offered the January 2006 affidavits of Professor Bassiouni and Professor Stile.

Professor Bassiouni averred that without a carichi pendenti, it was "impossible

---

**80.** Because of the possibility that the government may submit additional documentation under article XI to establish probable cause for the article 75 charges, this court addresses the issue of the arrest warrant's validity in the interest of expediting any such future proceedings.

to know" if the Pretrial Custody Order [81] was "still valid." (Docket Entry # 27, Ex. 1, ¶ 7). It was also "impossible to know what the status of" the arrest warrant was without a carichi pendenti. (Docket Entry # 27, Ex. 1, ¶ 8). Professor Bassiouni averred that a pretrial custody order was not an arrest warrant and that the time period of pretrial custody is limited under Italian law until entry of a judicial order transforming the custody order into an arrest warrant, an event which occurs "after a person has been remanded to trial." (Docket Entry # 27, Ex. 1, ¶ 7).

Professor Stile similarly attested to the need for a carichi pendenti. (Docket Entry # 27, Ex. 2, p. 5; Docket Entry # 27, p. 17, "Professor Stile ... observed that absent a certificate of 'carichi pendenti' there is no actual criminal charge in Italy"). He also observed that a pretrial custody order such as the Preventive Order in the case at bar is typically "issued during the preliminary investigation, and cannot extend more than two years," although he also acknowledged that the two year period was "peremptory only." (Docket Entry # 27, Ex. 2, p. 5).

After the filing of these affidavits and the supplemental memorandum, the government filed the 2006 carichi pendenti. In conformity with the averments of the relator's experts, the carichi pendenti therefore evidences the validity of the pending article 75 charges in the Preventive Order and the validity of the pending article 71 charge in the arrest warrant against the relator.[82] Furthermore, the 2006 carichi pendenti reflects that the article 75 charges were "[s]ent to court" on October 12, 1990, and the article 71 charge was "[s]ent to court" on May 16, 1991. Accordingly, the relator's argument regarding the alleged absence of a formal charge and valid arrest warrant pending against the relator, whether based upon the terms of the 1983 Treaty or due process concerns, is not persuasive.

 Finally, the relator has not been deprived of due process because of an inability to cross examine the government's three affiants.[83] *See Oen Yin–Choy v. Robinson,* 858 F.2d 1400, 1406–1407 (9th Cir.1988) (rejecting argument that court violated relator's "due process rights when it denied his request to cross-examine an individual who submitted an affidavit in support of extradition"); *Messina v. United States,* 728 F.2d 77, 80 (2nd Cir.1984) ("[a]s in the case of a grand jury proceeding, a defendant has no right to cross-examine witnesses" in an extradition proceeding). Moreover, the government's submissions were not late. Rather, this court allowed the government the opportunity to file the affidavits up to and including February 3, 2006.[84]

---

81. Professor Bassiouni refers to the Preventive Order as the Pretrial Custody Order.

82. Professor Bassiouni's later affidavit dated February 7, 2006, is tellingly silent about the effect of the recently filed 2006 carichi pendenti. He also averred that he was not retreating from the opinions in the first affidavit. (Docket Entry # 27, Rex. 1, ¶ 2). Notwithstanding the opportunity, the relator chose not to submit a second affidavit from Professor Stile. Instead, the relator unconvincingly asserted in the most recent memorandum, without affidavit support, that the 2006 carichi pendenti "does not in any manner address the issue of the legal validity or pendency of these instruments," referring to the government's "two arrest warrants." (Docket Entry # 27, p. 2 & fn. 1).

83. In prior footnotes, this court previously addressed and rejected additional due process concerns posited by the relator.

84. It is also worth noting that the relator's complaints about the government's "29 pages of additional argument and testimony" submitted by the government on February 3, 2006, overstates the filing. The government's

## CONCLUSION

In accordance with the foregoing opinion, this court finds that the relator is extraditable for the narcotic offense charged under article 71 aggravated by the fact that he belonged to a criminal association and hereby **CERTIFIES** this finding to the Secretary of State as required under section 3184. It is further **CERTIFIED** that the evidence is sufficient to sustain the article 71 charge against the relator under the provisions of the 1983 Treaty. The formal request for extradition (Docket Entry # 18) is **ALLOWED** for the article 71 offense. The government shall, no later than four business days after the date of this decision, file a proposed form of Certification of Extraditability to be transmitted to the Secretary of State of the United States in accordance with this decision and the requirements of law. Once executed, the Clerk of Court shall transmit to the Secretary of State of the United States a certified copy of the record including the evidence received in these extradition proceedings and the attached exhibits to the various filings, a certified copy of all testimony taken in these extradition proceedings, a certified copy of this Memorandum and Order, a certified copy of the complaint including the amended complaint and all attached exhibits, and a certified copy of the formal request for extradition and all attachments in the extradition package attached thereto and marked collectively as exhibit A.

At this juncture, however, the record fails to contain evidence sufficient to sustain the article 75 charges. The *non bis in idem* clause of the 1983 Treaty, however, does not bar the relator's extradition on these charges.

Finally, the government shall prepare the proper warrant for the commitment of the relator under section 3184 no later than four business days after the date of this decision.

brief was only six pages in length. In addition to the short translation of article 649, the three accompanying affidavits (not counting the Italian versions) amounted to 12 pages of translated English text. This court gave the relator the opportunity to file a response expressly limited to five pages. Without filing a formal motion seeking leave of court, the relator then filed a 15 page brief with an attached nine page affidavit from Professor Bassiouni. The relator's 24 page filing therefore provided him ample opportunity to respond to the government's essentially 18 page filing.